Davis, Judge,
dissenting:
The court holds, and plaintiff expressly admits in its briefs, that prior to the 1952 contract plaintiff had no depletable interest in the natural gas produced by and purchased from Shamrock. At the oral argument, after questioning from the bench, plaintiff ultimately withdrew from this concession, but its original position was clearly right. Under the *556 1935 agreement (as supplemented), plaintiff’s predecessor had no “economic interest” in the gas in place but only the “economic advantage” possessed by a purchaser of the gas who has obtained favorable terms from the seller. Helvering v. Bankline Oil Co., 303 U.S. 362 (1938), authoritatively ruled that a taxpayer which purchased gas from the producer, and then processed it (by removing the heavier hydrocarbons), was not entitled to depletion. For the period before 1953, this holding blankets plaintiff a fortiori; plaintiff was further removed than the purchaser in Banlclme from the gas in place since it purchased the gas from Shamrock after the latter had extracted the gas and removed the heavier hydrocarbons. The fact that in this case the agreement was for the life of the seller’s resources in Moore County does not distinguish Bankline; there, one type of contract called for the purchase of all natural gas produced at a given well (id., at 365). See, also, Scofield v. La Gloria Oil & Gas Co., 268 F.2d 699 (C.A. 5,1959).
I can discern no transformation, via the 1952 contract, from a mere economic advantage to an economic interest in the gas in place. That new contract did not purport to grant plaintiff any property interest — e.g., leasehold or fee— either in the land from which Shamrock drew its gas or in the gas itself.[7] No other change in status, as between the parties, is spelled out in the phrasing of the agreement. Bather, the paragraphs of the preamble (together with the circumstances surrounding the new pact) indicate that the parties simply desired to rearrange the terms of purchase and sale for their mutual advantage. Plaintiff wished to shut down its carbon black plant and to resell all of the gas purchased from Shamrock; the latter wished to sell the gas more profitably to another company; both parties “con- *557 eluded that it would be more economical and convenient to arrange for the resale of the aforesaid volumes to be made by Shamrock in its own name and on its responsibility as between the seller and purchaser of such gas.”[8] The resulting agreement merely transferred from plaintiff to Shamrock, its vendor, the right to sell for it the part of the residue gas which it was required under the old contract to purchase and which it could resell; plaintiff’s compensation was to be a share of Shamrock’s new (and higher) selling price. The transaction, though more complex, remained at bottom one of sale and purchase. Plaintiff gained no property interest of any kind in the land or minerals.
Aside from Commissioner v. Southwest Exploration Co., 350 U.S. 308 (1956), no Supreme Court decision has allowed depletion to a taxpayer who did not have either a fee or leasehold interest in the oil-producing property itself. Taxpayer equates itself with the upland owners in Southwest Exploration whose land was essential to drilling operations and whose contribution of that essential upland “was an investment in the oil in place sufficient to establish their economic interest” (id. at 316). The investment here, it is argued, was the former contractual right to obtain residue gas from Shamrock; that contribution, it is also said, is essential to Shamrock’s producing activities. The opinion
*558 in Southwest Exploration, however, cautions that the Supreme Court was not taking a drastic step away from the prior doctrine (id. at 316-17). In my view, the theory of that decision cannot properly be applied to plaintiff’s case.
The upland in Southwest Exploration was physically essential (under California law) “to the drilling for and extraction of oil” (350 U.S. at 317); but no interest of plaintiff’s, contractual or proprietary, was essential to the physical process of extraction and production of gas by Shamrock. That company could bring up and process the gas without trenching on any of taxpayer’s rights and without its leave. Taxpayer’s concern did not begin with the raw gas as it came from the well. Nor did that concern even commence with the manufacture of residue gas. Just as in the pre-1953 period, taxpayer’s concern only began with the sale by Shamrock of the residue gas. Prior to that stage, plaintiff had no connection with the mineral. Under the express provisions of the 1952 agreement, Shamrock could use the gas, without accounting to plaintiff in any way, for specified ends of its own — -including use for fuel for compression purposes, for processing and production purposes, and for manufacturing steam. Not until the moment of sale did any obligation to plaintiff arise or plaintiff have any concern with the gas.[9] This was not an interest in the gas in place.
The court, in holding otherwise, stresses the fact that there was no way for either party to receive any funds unless Shamrock removed and used or sold the commodity itself. But the test of a depletable interest is not the mere participation of the taxpayer in the realization of gain from the mineral. The regulations provide (Treas. Beg. 118, § 39.23 *559 (m)-l(b)) that “an agreement between the owner of an economic interest [i.e., Shamrock] and another entitling the latter to purchase the product upon production or to share in the net income derived from the interest of such owner does not convey a depletable economic interest.” The BanJdine decision, swpra, similarly held against a depletable interest where the contractor had the right to purchase all the gas from the well. See, also, Parsons v. Smith, 359 U.S. 215 (1959); Scofield v. La Gloria Oil Gas Co., supra. In those situations it was just as true as here that neither party — landowner or contractor — could receive any funds unless the owner removed and sold the gas. The same was true under plaintiff’s pre-1952 agreement. As in that instance, this factor is insufficient to give plaintiff an economic interest in the gas in place.[10]
I am concerned, too, that the rearrangement of plaintiff’s contract with Shamrock should be considered the equivalent of a capital investment, in 1952, in the mineral. If such an investment is deemed to have been made here, it would appear relatively easy for a contractor with a mere “economic advantage” to obtain a depletable “economic interest” by a reshuffling of the contractual terms — and without the grant of a recognizable property interest in the land or mineral. The Supreme Court seems to have had a more conventional and substantial type of “investment” in mind. See Parsons v. Smith, supra; Commissioner v. Southwest Exploration Co., supra.
For these reasons, I would grant judgment for the defendant.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Mastín Gr. White, and the briefs and argument of counsel, makes findings of fact as follows:
1. The plaintiff was, at all times pertinent to this litigation, a corporation organized and existing under the laws of the State of Delaware, with its principal office and place of business at No. 380 Madison Avenue, New York 17, New *560 York. When the petition was filed, the plaintiff’s name was Columbian Carbon Company. On January 31, 1962, the plaintiff’s name was changed to CBN Corporation, as evidenced by a Certificate of Amendment of Certificate of Incorporation of Columbian Carbon Company dated January 25, 1962, and filed with the Secretary of State of Delaware on January 31,1962. This name change resulted from the transfer of substantially all of the properties of the plaintiff to Columbian Carbon Company (formerly Cities Service Carbon Company) under the terms of a reorganization. As required by the Assignment of Claims Act (31 U.S.C. 203), however, the plaintiff has retained legal title to the claim which forms the basis of this action, as evidenced by the Agreement, Conveyance and Assignment dated January 31, 1962.
2. Jurisdiction to hear and determine this cause at this time is conferred upon the Court of Claims by section 3772 (a) (2) of the Internal Revenue Code of 1939' and by section 7422(a) of the Internal Revenue Code of 1954. Jurisdiction of the subject matter is conferred upon the Court of Claims by section 1491, Title 28, U.S. Code.
¡3. This action is brought for the recovery of the total amount of $46,320.60, representing income tax collected from the plaintiff for the calendar year (hereinafter referred to as the “tax year”) 1953, or such other amount as may be legally refundable, together with statutory interest thereon.
¡4. The plaintiff kept its books and reported its income for Federal tax purposes on the accrual and calendar year basis.
5. The plaintiff duly made and timely filed its Federal Consolidated Corporate Income Tax Return for the tax year 1953, which showed a consolidated income tax liability of $3,921,707.66. The consolidated income tax liability of $3,921,707.66 shown on the return was duly paid by the plaintiff on the following dates:

Date of payment Amount

March 12, 1954-$1, 771,438.60
June 14, 1954_ 1, 758, 098. 30
September 15, 1954- 196,085. 39
December 14, 1954_ 196, 085.37
3,921,707.66
*561 6. On or about March 28,1957, the plaintiff received from the District Director of Internal Revenue for the Upper Manhattan District of New York a revenue agent’s report dated February 26, 1957. The report made certain adjustments in the income tax return referred to in finding 5, and proposed a net deficiency of consolidated income tax in the amount of $115,574.37, together with interest of $19,042.86, for the tax year 1953. Pursuant to the report, the Commissioner of Internal Revenue made an additional assessment of $115,574.37, plus interest thereon in the amount of $19,042.86. Notice of such assessment was received by the plaintiff on or about April 16,1957. The plaintiff paid the additional assessment on April 17, 1957, to the District Director of Internal Revenue for the Upper Manhattan District of New York.
7. (a) On or about June 28, 1956, the plaintiff made and duly filed with the District Director of Internal Revenue for the Upper Manhattan District of New York a claim for the refund of an alleged overpayment of income tax for the tax year 1953 in the amount of $46,320.60, or such greater amount as might be legally refundable, together with statutory interest thereon. The claim for refund asserted that the Commissioner had erred in disallowing a deduction for percentage depletion under section 114(b) (3) of the Internal Revenue Code of 1939 on account of royalty payments to the plaintiff from The Shamrock Oil and Gas Corporation.
(b) Statutory notice of the disallowance of the plaintiff’s claim for refund was issued on May 29, 1959.
(c) No action or suit has been commenced or is pending in any other court on account of this claim. No action has been had thereon in the Congress or by any of the executive departments or agencies, other than as stated herein.
(d) The plaintiff is the owner of the claim stated herein, and no assignment or transfer of legal title thereto has been made.
8. The chain of events leading up to the present litigation began in October 1935. At that time, The Shamrock Oil and Gas Corporation (which will usually be referred to hereafter in the findings as “Shamrock”) was engaged in the production of natural gas from lands owned or leased by *562 Shamrock in Moore County, Texas, and in the extraction of the heavier liquid and liquefiable hydrocarbons from the natural gas. The extraction process was performed at a plant which Shamrock operated in Moore County, Texas, and which was known as the McKee Plant.
¡9. Natural gas is ordinarily composed of various hydrocarbons, which, in turn, are composed of atoms of carbon and atoms of hydrogen in various combinations, such as the f ollowing:
Methane (CH4)
Ethane (C2H6)
Propane (CSH8)
Isobutane (O4H10)
Normal butane (C4H10)
Isopentane (0„H12)
Normal pentane (C6H12)
Hexane (C6H14)
Some of the hydrocarbons are in liquid form as the natural gas reaches the surface of the ground in the process of production, and others are liquefiable. Such hydrocarbons can be, and they frequently are, separated by the producer from the lighter hydrocarbons in the natural gas.
JO. After the liquid and liquefiable hydrocarbons are removed from the raw gas, there remains approximately 95 percent of the volume of the original raw gas. The remaining gas is sometimes referred to as residue gas.
11. After Shamrock removed some or all of the liquid and liquefiable hydrocarbons from its natural gas, the lighter hydrocarbons that remained in the natural gas were not altered in their individual physical or chemical characteristics.
12. (a) On October 1, 1935, Shamrock entered into an agreement with the Western Carbon Company, which was engaged in the manufacture of carbon black. Under this agreement, the Western Carbon Company agreed to construct, in the vicinity of Shamrock’s McKee Plant, a plant for the manufacture of carbon black that would have a capacity to handle a minimum of 30,000,000 cubic feet of natural gas per day. The agreement also provided that Shamrock (referred to in the agreement as “Seller”) would sell to the Western Carbon Company (referred to in the *563 agreement as “Buyer”), and that the latter would purchase from Shamrock, a daily minimum of 30,000,000 cubic feet of residue gas (i.e., natural gas from which the liquid and liquefiable hydrocarbons had been removed by Shamrock).
(b) The agreement referred to in paragraph (a) of this finding further provided in part as follows:
6. It is understood and agreed that all of the said gas so to be delivered by Seller to Buyer shall be used by Buyer in the manufacture of carbon black, except (1) so much thereof as may be necessary for the operation of the said carbon black plant and for use in the dwellings of employees of the Buyer, and (2) that said gas may be resold by Buyer upon the following terms and conditions:
Buyer shall have the right at any time to cease burning all or any part of the gas it has been burning, and resell for other purposes said gas, or such part thereof as it ceases to burn, at the price of not less than two (2<f.) cents per thousand cubic feet, and in the event of such resale Seller shall receive said base price of two (2‡) cents per thousand cubic feet to take care of royalties, lease expenses, etc., and the remainder of the said resale price shall be divided between the parties hereto in the proportion of fifty per cent (50%) thereof to Buyer and fifty per cent (50%) thereof to Seller. If Buyer at any time is prevented by law from burning all or any part of the gas which it has been burning and is unable to make resale thereof when so prevented, and Seller is later able to make sale thereof, Buyer shall be entitled to the same part of the proceeds of sale as if it had negotiated or effected said sale.
* * # # *
8. The duration of this agreement shall be the duration of the natural gas resources of Seller at any time legally available for the manufacture of carbon black derived from sources owned or controlled by it (including purchase or processing agreements) located in Moore County, Texas, or tributary to gasoline extraction plants of Seller located in Moore County, Texas. * * * *****
14. The price to be paid to Seller for gas delivered to Buyer shall be 30% of the carbon black production of Buyer’s plant, hereinafter referred to as royalty, which shall, at Buyer’s expense, be placed in Buyer’s warehouse in paper bags, uncompressed. * * *
*****
*564 18. All rights and obligations hereunder shall extend to and be binding upon the parties hereto, their successors and assigns. It is further agreed that the provisions of this agreement regarding the production and delivery of gas by Seller, and the acceptance and payment for same by Buyer, shall be deemed to be covenants running with the respective lands, leases, purchase agreements, plants and pipe lines, together with their appurtenances, of the parties hereto. And the parties hereto covenant that they will not dispose of any of same in bulk, or in such material part as to disable them from performing their obligations hereunder, without causing the party to whom such property shall be transferred, together with its successors and assigns, to assume and be bound by the terms hereof. Provided, however, that nothing herein contained shall prevent Seller from selling, trading or abandoning any lease or gas contract in the ordinary course of business, or of exchanging any part of its gas resources for other gas resources of substantially equal amount.
¡13. An agreement similar to the one referred to in finding 12 was entered into on October 1, 1935, between Shamrock (as “Seller”) and the Eeliance Carbon Company, Inc. (as “Buyer”).
14. In connection with the agreements referred to in findings 12 and 13, Shamrock, Eeliance Carbon Company, Inc., and Western Carbon Company entered into a subsidiary agreement, also dated October 1, 1935. In this subsidiary agreement, Shamrock granted to Eeliance Carbon Company, Inc., and to Western Carbon Company “* * * the first right, in priority to all other uses or dispositions of its natural gas made by * * * [Shamrock] in twelve thousand (12,000) acres of gas territory owned or controlled by * * * [Shamrock] and located in Moore County, Texas.” The subsidiary agreement further provided (among other things) that “All rights and obligations hereunder shall extend to and be binding upon the parties hereto, their successors and assigns.”
15. In a third agreement that was entered into on October 1, 1935, between Shamrock and the Western Carbon Company, it was provided in part as follows:
2. It is agreed between the parties hereto that in the event any flat tax is levied upon the production or sale of the natural gas, which is the subject of said agreement, *565 either by the United States, the State of Texas or a,ny municipal division thereof, Buyer shall bear one-third of said tax and Seller shall bear two-thirds thereof. If Buyer is required to pay said tax, Seller shall reimburse Buyer accordingly, and if Seller is required to pay said tax, Buyer shall reimburse Seller accordingly.
8. In the event the gas which is the subject of said agreement shall not be used in the manufacture of carbon black but shall be resold, as in said agreement provided, the amount of any such tax shall be added to the base price thereof, and the remainder of the price of said gas upon resale divided equally between the parties hereto.
4. All rights and obligations hereunder shall extend to and be binding upon the parties hereto, their successors and assigns.
16. Subsequent to the making of the agreement referred to in finding 12, the Western Carbon Company constructed in Moore County, Texas, a carbon black plant that had a capacity sufficient to handle a minimum of 30,000,000 cubic feet of natural gas per day. The plant was located in the general vicinity of Shamrock’s McKee Plant. The cost of the carbon black plant was $1,221,405.
17. On January 2, 1936, the Western Carbon Company assigned to the plaintiff all of the former’s rights in the agreements referred to in findings 12, 14, and 15.
18. An agreement amendatory of the agreement referred to in finding 12 was entered into between Shamrock and the plaintiff under the date of January 4,1937. In the amenda-tory agreement, the plaintiff, which was then operating the carbon black plant mentioned in findings 12(a) and 16, agreed to expand its carbon black plant by the construction of additional units that would have a capacity to handle a •minimum of 15,000,000 cubic feet of natural gas per day. Also, the amount of gas to be sold by Shamrock and purchased by the plaintiff was increased to the extent of an additional daily minimum of 15,000,000 cubic feet of gas. The amendatory agreement further provided (among other things) that “Buyer [plaintiff] shall have the first right hereunder in priority to all other uses or disposition of its natural gas made by Seller [Shamrock] in three thousand (3,000) acres of gas territory owned or controlled by Seller *566 and located in Moore County, Texas, the gas from which is legally available for the manufacture of carbon black.”
19. In April 1945, the plaintiff completed the construction of additional units to its carbon black plant. These additional units were of a capacity sufficient to handle a minimum of 15,000,000 cubic feet of natural gas per day. The cost of the additional units was $216,455.
20. (a) By means of an agreement dated November 11, 1946, between Shamrock and the plaintiff, Shamrock increased “ * * * the acreage reserves from which the Buyer [plaintiff] has the prior right to purchase and receive gas under the Gas Sales Agreements dated, respectively, October 1,1935, and January 4,1937, by an additional amount of 3,250 acres * * * .”
(b) The agreement of November 11, 1946, amended paragraph 6 of the agreement mentioned in finding 12 by substituting “Three Cents (3$)” for “two (24) cents” where-ever the latter appeared in the paragraph, and by adding the following to the paragraph:
Seller will desulphurize all said gas to be resold so that same shall contain not more than one-half (%) grain of hydrogen-sulphide per one hundred (100) cubic feet, and will cause same to enter the pipe line extending from Seller’s processing plant to the plant of Buyer at a pressure of not less than one hundred (100) pounds per square inch gauge.
(c) The agreement of November 11, 1946, substituted for paragraph 14 of the agreement mentioned in finding 12 a provision calling for the payment of a fixed price per Mcf on the gas delivered by Shamrock to the plaintiff after January 1, 1946.[11] The price was to increase gradually in accordance with the following schedule:

Price per Mcf Period (cents)

Jan. 1-July 31, 1946_2.435
Aug. 1, 1946-Dec. 31, 1947_3
Jan. 1, 1948-Dec. 31, 1952_4
Jan. 1, 1953-Dec. 31, 1957_4.25
After Jan. 1, 1958_5.5
*567 21. Further amendatory agreements were entered into between Shamrock and the plaintiff under the dates of July 16, 1947, June 27,1949, July 1,1949, July 12,1951, and September 11, 1951. One result was that the provisions of earlier agreements relative to the amount of natural gas that was to be sold by Shamrock and purchased by the plaintiff, and the extent of Shamrock’s gas reserves that should be dedicated to this relationship, were superseded by a provision reading in part as follows:
* * * [T]he aggregate volumes of residue gas which Buyer [plaintiff] has the prior right to purchase and which Seller [Shamrock] has the obligation to sell and deliver to Buyer * * * is the fractional part of the residue gas remaining (after being processed for the recovery of liquid hydrocarbons in either Seller’s McKee plant or its recently acquired Sunray plant, located near Sunray, Moore County, Texas) from all of the sour gas reserves of Seller heretofore accepted by Buyer * * * represented by a fraction, the nominator [sic] of which is 12,250, and the denominator of which is 62,225 * * *. Said fractional part of said residue gas is hereinafter referred to as the “dedicated reserves” of Buyer. It is agreed, however, if there shall be available from such dedicated reserves of Buyer in excess of forty million (40,000,000) cubic feet daily, averaged monthly, Buyer shall not be obligated to purchase in excess of forty million (40,000,000) cubic feet daily, but shall be privileged to purchase, by notifying Seller in writing of its desire to so purchase, the volumes attributable to the reserves of Buyer up to forty-two million (42,000,000) cubic feet daily when such volumes are available from such sources * * *.
22. Subsequent to September 11, 1951, Shamrock represented to the plaintiff that Shamrock desired to be free of the dedication to the plaintiff of its sour gas reserves in Moore County, Texas, in order that Shamrock would be free to negotiate more favorable contracts with the Northern Natural Gas Company.
23. On October 15, 1952, Shamrock negotiated a contract effective January 1, 1953, for the sale of gas — including gas from the acreage previously dedicated for the life of the field *568 to the plaintiff — to the Northern Natural Gas Company for the following prices:

Price per Mcf

Period (cents)

Jan. 1-Aug. 31, 1953_ 9
Sept. 1,1953-Dee. 31,1957_10. 5
Jan. 1, 1958-Dec. 31, 1982_11.5
After Jan. 1, 1963_12.5
The contract of October 15, 1952, provides that the prices are to be reduced should the gas delivered to the Northern Natural Gas Company contain less than 975 B.t.u.’s per cubic foot, such reduction to be the product obtained by multiplying the contract price stated by the quotient obtained by dividing the heating value of the delivered gas in B.t.u.’s per cubic foot by 975.
24. On November 19, 1952, Shamrock and the plaintiff entered into a contract that superseded the prior agreements between the parties. This contract provides in part as follows:
1. Effective January 1,1958, the aforesaid agreements and contracts between Shamrock and Columbian (or its predecessor) shall be terminated and be and become of no further force and effect, except as to final accounting between the parties thereto with respect to sales ana deliveries of residue gas thereunder consummated prior to January 1, 1953, and thereafter this contract and the provisions hereof shall fully control the rights, duties and obligations of the parties hereto with respect to the subject matter of the aforesaid contracts.
2. Shamrock agrees that it will pay to Columbian, as hereinafter provided, certain monetary consideration[12] in respect of certain volumes of residue gas hereinafter specified, subject to the provisions hereinafter contained. The volumes of residue gas upon which payments will accrue and are to be made by Shamrock to Columbian shall be that part of all of the residue gas remaining from gas produced on and after January 1, 1953 from Shamrock’s sour gas reserves (as those reserves are described on Schedule A attached hereto) from gas wells having a shut-in pressure of more than fifty (50) pounds per square inch gauge represented by a fraction, the numerator of which is 9,000 and the denominator of which is 62,625.
*569 8, In determining the volumes of residue gas remaining from gas produced from Shamrock’s sour gas reserves there shall be deducted from gas produced therefrom:
(a) All liquids or liquefiable hydrocarbons extracted or removed by Shamrock from such production;
(b) All volumes of gas reserved to lessors under the provisions of oil and gas leases referred to on Schedule A attached hereto;
(c) Such volumes of gas produced from such reserves and used for drilling wells for the production of oil and gas and for maintenance and operation of the leases and the production of oil and gas from the lands referred to in Schedule A attached hereto; and
(d) The proportionate part of gas produced from said reserves that the total volumes of gas produced therefrom bear to the total volumes of all gas gathered and processed by Shamrock for the recovery of liquid hydrocarbons at its McKee and Sunray Plants in Moore County, Texas (or other plants where any part of the gas from such reserves is processed for liquid hydrocarbons) that may be lost or used in such processing (including the removal of hydrogen sulphide therefrom) through line and gathering losses, volumes used for fuel for compressors and compressor stations (except compressor fuel required to deliver casinghead gas into Shamrock’s main line gathering system), volumes for fuel for plants for recovery, fractionating and processing liquids and liquid hydrocarbons and hydrogen sulphide from the gas and the manufacturing of elemental sulphur and for steam in connection with such purposes, houses of employees and offices of Shamrock in the field.
4. There shall be no restriction nor limitation on Shamrock’s right to remove liquid or liquefiable hydrocarbons or hydrogen sulphide from the gas produced from said reserves and there shall be no obligation, express or implied, on Shamrock’s part to make payments to Columbian on the proportionate part of said residue gas above specified, except as, if and when such residue gas is sold or used by Shamrock for purposes other than specified in subparagraphs (a), (b), (c) and (d) of Section 3 above; provided that if Shamrock should cease to process through its plant or plants the gas produced from its sour gas reserves, or any part thereof, and shall make sale thereof at the well or wells where produced, then such payments shall be applicable to the propor *570 tionate part of tlie raw gas volumes that may be sold by Shamrock.
‡ * ❖
9. Shamrock will pay all ad valorem taxes on its leases and on its properties. No portion of gross production taxes, severance taxes or other excise taxes levied prior to March 1, 1950 upon or with respect to the volumes of residue gas in respect of which Shamrock shall become obligated to make payments to Columbian hereunder shall be borne by Columbian. Columbian agrees to pay to Shamrock, when billed by Shamrock, sums equal to one-sixth (%) of seven-eighths (%) of all increases, effective March 1, 1950 and thereafter, in such present gross production taxes, severance taxes and other excise taxes upon, and one-sixth (%) of seven-eighths (%) of any new or additional excise taxes levied upon or with respect to the volumes of residue gas in respect of which Shamrock may be required hereunder to make payments to Columbian or the production, transportation or handling thereof. If any such tax is imposed upon or with respect to raw gas from which residue gas is attributable, the portion of such tax attributable to such residue gas for the purposes hereof shall be represented by a fraction, the numerator of which is the volume of such residue gas the denominator of which is the volume of such raw gas; that is, for example, if a new or increased tax is imposed with respect to a unit of one thousand (1,000) cubic feet of raw gas from which nine hundred fifty (950) cubic feet of residue gas are attributable in respect of settlement to Columbian hereunder, Columbian shall pay one-sixth {%) of seven-eighths (%) of 950/1,000 of the tax imposed on such unit of one thousand (1,000) cubic feet of gas. Provided, however, if such tax or taxes should hereafter eliminate or not include royalty owners as taxpayers thereunder, then the fraction of seven-eighths (%) first above used in this paragraph shall be increased to eight-eighths (8/8) with respect to any such tax.
25. (a) By a letter agreement among the plaintiff, United Carbon Company, Inc. (Maryland), and Shamrock dated December 16, 1952, the plaintiff arranged to obtain from Shamrock natural gas, with the liquid and liquefiable hydrocarbons removed, in a volume approximating 21,000,000 cubic feet daily, which natural gas Shamrock was under contract to deliver to United Carbon Company, Inc. (Maryland).
*571 (b) In consideration for obtaining the natural gas mentioned in paragraph (a) of this finding, the plaintiff authorized Shamrock to pay to United Carbon Company, Inc. (Maryland) 40 percent of the monetary consideration which otherwise would have been payable to the plaintiff under the contract dated November 19, 1952, between the plaintiff and Shamrock.
(c) The letter agreement dated December 16, 1952, covered the period from 7:00 a.m. on January 1, 1953, to 7:00 a.m. on September 1,1953.
26.Pursuant to the contract dated November 19, 1952, as modified by the letter agreement dated December 16,1952, Shamrock paid the plaintiff the following amounts in the tax year 1953:
Mcf sold to Gross pay-Northern Natural ment due Month Gas Company plaintiff Amount due United Carbon Co. Net payment due plaintiff
January - 705,004 $42,300.24 $16, 920.10 $25,380.14
February _ 616,380 36,982.80 14, 793.12 22,189. 68
March- 676,091 40,565.46 16,226.18 24,339. 28
April - 635,444 38,126.64 15,250. 66 22, 875.98
May- 620,040 37,202.40 14, 880.96 22,321.44
June - 631,155 37,869.30 15,147. 72 22, 721. 58
July_ 591,978 35,518.68 14,207.47 21,311.21
August _ 532,989 31,979.34 12,791. 74 19,187. 60
September _ 551,076 33,064.56 33, 064. 56
October_ 523,680 31,420.80 31,420.80
November_ 580,497 34,829.82 34, 829.82
December_ 538,019 32,281.14 32,281.14
27. In January 1955, the plaintiff paid to Shamrock the sum of $3,217.45, constituting the plaintiff’s share of increased production taxes, severance taxes, and other excise taxes levied upon or with respect to the volumes of gas for the period from January 1, 1953, to December 31, 1955, inclusive, as specified in paragraph 9 of the contract dated November 19,1952, between the plantiff and Shamrock. The plaintiff made such payments for the years 1956, 1957, and 1958 and for the period from January 1, 1959, through October 31, 1959, in the amounts of $1,378.94, $1,464.46, $965.23, and $812.32, respectively.
28. From 7:00 a.m. on July 29, 1956, through 7:00 p.m. on July 30, 1956, the Shamrock plant was shut down due to a fire. On that occasion, the raw gas was passed through *572 tbe plant without being processed, except for passage through the desulphurizer, and was sold to Shamrock’s customers; and the payment that was made to the plaintiff on account of such sales of raw gas included its proportionate share of the selling price of all such raw gas, including the liquid and liquefiable hydrocarbons. (See paragraph 4 of the contract dated November 19, 1952, as set out in finding 24.)
29. During the tax year 1953, Shamrock did not claim a deduction for percentage depletion with respect to any of the payments that were made to the plaintiff under the contract dated November 19, 1952.
CONCLUSION OK LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is entitled to recover, and judgment is entered to that effect. The amount of recovery will be determined pursuant to Pule 38(c) of the rules of this court.
In accordance with the opinion of the court and a memorandum report of the commissioner as to the amount due thereunder, it was ordered on March 20,1964, that judgment be entered for the plaintiff for $53,952.70, together with interest thereon, as provided by law, from April 17,1957.

 The 1962 agreement contains no provision declaring it a covenant running with the land, but merely the ordinary clause stating that the contract shall be binding and inure to the parties and their successors and assigns. In contrast, the earlier agreement contained, in addition to the normal clause relating to assignment, another clause specifically agreeing “that the provisions of this agreement * * * shall be deemed to be covenants running with the respective lands, leases,” etc., and also covenanting that the “parties * * * will not dispose of any of same in bulk, or in such material part as to disable them from performing their obligations hereunder, without causing the party to whom such property shall be transferred, together with its successors and assigns, to assume and be bound by the terms hereof.”

 The preamble to the 1952 contract discloses (In its fourth paragraph) that plaintiff desires to shut down its carbon black plant and “desires to effect a resale of the volumes of gas it is authorized to resell under the terms and provisions of the aforesaid contracts [i.e., the pre-1952 contracts].” (Emphasis added). In the fifth paragraph of the preamble, it is pointed out that any purchaser of such residue gas would have to receive it from Shamrock and would likewise have to deal with Shamrock on various matters (e.g., pressure, deliveries', etc.) ; the preamble then goes on to say that “the parties hereto, having considered such matters, have concluded that it would be more economical and convenient to arrange for the resale of the aforesaid volumes to be made by Shamrock in its own name and on its responsibility as between the seller and the purchaser of such gas and that an accounting between the parties hereto with respect to such resale volumes be made on a basis mutually satisfactory in lieu of the accounting between the parties required under the terms of the aforesaid contracts in the event a resale of such volumes to another purchaser should be accomplished by Columbian.” (Emphasis added.) The sixth paragraph of the preamble states that Shamrock “is willing to undertake to accomplish a resale of the volumes of residue gas which Columbian is authorized to resell under the provisions of the aforesaid contracts in lieu of making delivery thereof to Columbian, and is willing to make certain payments to Columbian with respect to the volumes of residue gas remaining from gas produced from its sour gas reserves to the extent of the volumes which Columbian would, except for this contract, be authorized to sell to others.” (Emphasis added.)

 The contract provided :
“4. There shall be no restriction nor limitation on Shamrock’s right to remove liquid or liquefiable hydrocarbons or hydrogen sulphide from the gas produced from said reserves and there shall be no obligation, express or Implied, on Shamrock’s part to make payments to Columbian [plaintiff] on the proportionate part of said residue gas above specified, except as, if and when such residue gas Is sold or used by Shamrock for purposes other than specified In subparagraphs (a), (b), (c) and (d) of Section 3 above; provided that if Shamrock should cease to process through its plant or plants the gas produced from its sour gas reserves, or any part thereof, and shall make sale thereof at the well or wells where produced, then such payments shall be applicable to the proportionate part of the raw gas volumes that may be sold by Shamrock.”

 In Anderson v. Helvering, 310 U.S. 404, 409 (1940), the Court said:
“A share In the net profits derived from development and operation * * * does not entitle the holder of such interest to a depletion allowance even though continued production is essential to the realization of such profits.”

 Other changes made by the agreement of November 11, 1946, do not have any particular significance from the standpoint of the present litigation.

 Basically, Shamrock agrees to pay the plaintiff 6 cents per Mcf in connection with the sales of residue gas tha,t are within the scope of this contract.