## COMMISSIONER OF INTERNAL REVENUE *v.*
## SOUTHWEST EXPLORATION CO.

NO. 286.

Argued January 23–24, 1956.—Decided February 27, 1956.

*Hilbert P. Zarky* argued the causes for petitioners. With him on the briefs were *Solicitor General Sobeloff, Assistant Attorney General Holland* and *Ellis N. Slack.*

*Melvin D. Wilson* argued the cause and filed a brief for respondent in No. 286. *Joseph D. Peeler* entered an appearance for respondent.

*Harry R. Horrow* argued the cause for respondent in No. 287. With him on the brief was *Francis R. Kirkham.*

MR. JUSTICE CLARK delivered the opinion of the Court.

The Southwest Exploration Co., respondent in No. 286, contracted to develop certain oil deposits lying off the coast of California by whipstock drilling from sites located on the property of adjacent upland owners. Southwest agreed to pay to such owners 24½% of the net profits for the use of their land. Both Southwest and the upland owners sought to take the statutory depletion allowance of 27½% on this share of the profits. The Tax Court decided that Southwest was entitled to the depletion allowance, 18 T. C. 961, and the Ninth Circuit affirmed, 220 F. 2d 58. In the other case, the Court of Claims held that one of the upland owners, Huntington Beach Co., respondent in No. 287, was entitled to the depletion allowance on its share of the net income, 132 Ct. Cl. 427, 132 F. Supp. 718. We granted certiorari in both cases, 350 U. S. 818, because both the drilling company and the upland owners cannot be entitled to depletion on the same income. We agree with the Court of Claims.[1]

---

[1] In the courts below, the Commissioner took technically inconsistent positions, opposing the depletion allowance in both cases and losing in both. Before this Court the Commissioner urged that depletion be denied the drilling company and allowed to the upland owners on the latter's 24½% of net profits.

The California State Lands Act of 1938 provided that the State's offshore oil might be extracted only from wells drilled on filled lands or slant drilled from upland drill sites to the submerged oil deposits.[2]   Other provisions of the same statute required that "derricks, machinery, and any and all other surface structures, equipment, and appliances" be located only on filled lands or uplands.   It was further provided that the state commission might require each prospective bidder for such a state lease to furnish, as a condition precedent to consideration of his bid, satisfactory evidence of "present ability to furnish all necessary sites and rights of way for all operations contemplated under the provisions of the proposed lease." [3]

In 1938 California published notice of its intention to receive bids for the lease of certain oil lands pursuant to this statute.   At the time Southwest—a corporation organized in 1933 but completely inactive until the transaction at issue here—did not own, lease, operate or control any of the uplands adjacent to the area of oil deposits. It is agreed that there were no filled lands available. Southwest entered into three agreements with the upland owners, and was granted the right of ingress to and egress from the designated uplands and the right to construct, use and maintain all equipment necessary for drilling on the same lands.   The upland owners reserved to themselves the right to give easements or subsurface well crossings in the uplands, except that they would not allow such easements for the purpose of drilling into the offshore oil deposits while Southwest retained an interest granted to it by state easement.   Southwest's rights were expressly subject to all rights previously granted by the upland owners.   The agreements defined "net profits"

---

[2] Cal. Stat. (Extra Session 1938), c. 5, § 87.

[3] *Id.*, § 89.

and provided that Southwest would pay a total of 24½% of its net profits from extraction and sale of oil to the upland owners.[4] It was also provided that the upland owners did not acquire a share in the lease or oil deposit by virtue of the last agreement and that it was not the intention of the parties to create a partnership relationship.

As a result of these agreements, the upland owners endorsed Southwest's bid for a lease submitted to the State of California. Southwest, as the only bidder, was granted "Easement No. 392" by the State in consideration of the "royalty to be paid, the covenants to be performed, and the conditions to be observed by the Grantee." One such condition was that set out in paragraph (1):

> "That each well drilled pursuant to the terms of this agreement shall be slant drilled from the uplands to and into the subsurface of the State lands. Derricks, machinery, and any and all other surface structures, equipment and appliances shall be located only upon the uplands and all surface operations shall be conducted therefrom."

The agreement further provided that, if Southwest should "default in the performance or observance of any of the terms, covenants and stipulations hereof," the State might re-enter, cancel the agreement or close down wells not being operated according to the agreement.

The wells drilled pursuant to this lease have produced oil continuously since 1939. In No. 286, *Southwest Exploration Co.,* the tax years 1939 through 1945 are involved. If Southwest may claim the depletion allow-

---

[4] This share was the total of the following percentages of net profits to be paid to the three upland owners:

17.75% to Huntington Beach Company.

1.576% to Pacific Electric Railway Company.

5.174% to Pacific Electric Land Company.

ance on the upland owner's share of the profits during this period, its tax liability is reduced by approximately $175,000. In No. 287, *Huntington Beach Co.*, the upland owner is claiming a tax refund of $135,000 for the year 1948 alone.[5]

An allowance for depletion has been recognized in our revenue laws since 1913. It is based on the theory that the extraction of minerals gradually exhausts the capital investment in the mineral deposit. Presently, the depletion allowance is a fixed percentage of gross income which Congress allows to be excluded; this exclusion is designed to permit a recoupment of the owner's capital investment in the minerals so that when the minerals are exhausted, the owner's capital is unimpaired. The present allowance, however, bears little relationship to the capital investment, and the taxpayer is not limited to a recoupment of his original investment. The allowance continues so long as minerals are extracted, and even though no money was actually invested in the deposit. The depletion allowance in the Internal Revenue Code of 1939 is solely a matter of congressional grace; it is limited to $27\frac{1}{2}\%$ of gross income from the property after excluding from gross income "any rents or royalties" paid by the taxpayer with respect to the property.[6]

---

[5] For the tax years 1942 through 1946, Huntington Beach Company claimed and was allowed to deduct depletion on its share of the net profits. The United States is seeking recovery of this money in a suit now pending in the United States District Court for the Northern District of California, Southern Division. The amount at issue there is something over $500,000.

[6] Pertinent sections of the Internal Revenue Code of 1939 provide:
"SEC. 23. DEDUCTIONS FROM GROSS INCOME.

"In computing net income there shall be allowed as deductions:

.        .        .        .

"(m) DEPLETION.—In the case of mines, oil and gas wells, other natural deposits, and timber, a reasonable allowance for depletion and for depreciation of improvements, according to the peculiar

The complexities of oil operations and risks incident to prospecting have led to intricate, multiparty transactions, so that it is often difficult to determine which parties are entitled to a part of the allowance. The statute merely provides in § 23 (m) that in the case of leases the depletion allowance should be "equitably apportioned between the lessor and lessee."

In determining which parties are entitled to depletion on oil and gas income, this Court has relied on two inter-related concepts which were first formulated in *Palmer* v. *Bender,* 287 U. S. 551. There, the taxpayer, a lessee of certain oil and gas properties, had transferred his interest in these properties to two oil companies in return for a cash bonus, a future payment to be made "out of one-half of the first oil produced and saved," and an additional royalty of one-eighth of the oil produced and saved. In

conditions in each case; such reasonable allowance in all cases to be made under rules and regulations to be prescribed by the Commissioner, with the approval of the Secretary. . . . In the case of leases the deductions shall be equitably apportioned between the lessor and lessee. . . .

"For percentage depletion allowable under this subsection, see section 114 (b), (3) and (4)." 53 Stat. 12, 14, 26 U. S. C. § 23.

"Sec. 114. BASIS FOR DEPRECIATION AND DEPLETION.

.         .         .         .         .

"(b) Basis for Depletion.

.         .         .         .         .

"(3) Percentage depletion for oil and gas wells. In the case of oil and gas wells the allowance for depletion under section 23 (m) shall be 27½ per centum of the gross income from the property during the taxable year, excluding from such gross income an amount equal to any rents or royalties paid or incurred by the taxpayer in respect of the property. Such allowance shall not exceed 50 per centum of the net income of the taxpayer (computed without allowance for depletion) from the property, except that in no case shall the depletion allowance under section 23 (m) be less than it would be if computed without reference to this paragraph." 53 Stat. 45, 26 U. S. C. § 114.

upholding the taxpayer's right to depletion on all such income, the Court based its decision on the grounds that a taxpayer is entitled to depletion where he has: (1) "acquired, by investment, any interest in the oil in place," and (2) secured by legal relationship "income derived from the extraction of the oil, to which he must look for a return of his capital." 287 U. S., at 557.

These two factors, usually considered together, constitute the requirement of "an economic interest." This Court has found the requisite interest in the oil in place to have been retained by the assignor of an oil lease, *Thomas v. Perkins,* 301 U. S. 655, the lessor of oil properties for a share of net profits, *Kirby Petroleum Co. v. Commissioner,* 326 U. S. 599, and the grantor of oil lands considered as an assignor of drilling rights, *Burton-Sutton Oil Co. v. Commissioner,* 328 U. S. 25. The Court found no such interest in the case of a processor of natural gas who had only contracted to buy gas after extraction, *Helvering v. Bankline Oil Co.,* 303 U. S. 362, and in the case of a former stockholder who had traded his shares in a corporation which owned oil leases for a share of net income from production of the leased wells, *Helvering v. O'Donnell,* 303 U. S. 370.

The second factor has been interpreted to mean that the taxpayer must look *solely* to the extraction of oil or gas for a return of his capital, and depletion has been denied where the payments were not dependent on production, *Helvering v. Elbe Oil Land Co.,* 303 U. S. 372, or where payments might have been made from a sale of any part of the fee interest as well as from production. *Anderson v. Helvering,* 310 U. S. 404. It is not seriously disputed here that this requirement has been met. The problem revolves around the requirement of an interest in the oil in place.

It is to be noted that in each of the prior cases where the taxpayer has had a sufficient economic interest to

entitle him to depletion, he has once had at least a fee or leasehold in the oil-producing properties themselves. No prior depletion case decided by this Court has presented a situation analogous to that here, where a fee owner of adjoining lands necessary to the extraction of oil is claiming a depletion allowance.

Southwest contends that there can be no economic interest separate from the right to enter and drill for oil on the land itself. Since the upland owners did not themselves have the right to drill for offshore oil, it is argued that respondent—who has the sole right to drill—has the sole economic interest. It is true that the exclusive right to drill was granted to Southwest, and it is also true that the agreements expressly create no interest in the oil in the upland owners. But the tax law deals in economic realities, not legal abstractions, and upon closer analysis it becomes clear that these factors do not preclude an economic interest in the upland owners.

Southwest's right to drill was clearly a conditional rather than an absolute grant. Without the prior agreements with the upland owners, Southwest could not even have qualified as a bidder for a state lease. Permission to use the upland sites was the express condition precedent to the State's consideration of Southwest's bid, and it was one of the express conditions on which "Easement No. 392" was granted to Southwest. For a default in that condition the State retained the right to re-enter or to cancel the lease. Thus it is seen that the upland owners have played a vital role at each successive stage of the proceedings. Without their participation there could have been no bid, no lease, no wells and no production.

But Southwest contends that the upland owners here contributed merely property which was useful but not necessary to the drilling operation. The facts are to the contrary. State law required that the wells be drilled either on the uplands or on filled lands, and there were

no filled lands available. By hindsight Southwest now suggests that it might have constructed a drilling island which might have been considered as filled land under the statute. Then, too, perhaps the State itself might have changed the law or condemned the uplands under existing law. But none of these possibilities occurred. The fact is that the drilling arrangement was achieved and oil produced in the only way that it could have been, consistent with state law and the express requirements of the State's lease.

Recognizing that the law of depletion requires an economic rather than a legal interest in the oil in place, we may proceed to the question of whether the upland owners had such an economic interest here. We find that they did. Proximity to the offshore oil deposits and effect of the state law combined to make the upland owners essential parties to any drilling operations. This controlling position greatly enhanced the value of their land when extraction of oil from the State's offshore fields became a possibility. The owners might have realized this value by selling their interest for a stated sum and no problem of depletion would have been presented. But instead they chose to contribute the use of their land in return for rental based on a share of net profits. This contribution was an investment in the oil in place sufficient to establish their economic interest. Their income was dependent entirely on production, and the value of their interest decreased with each barrel of oil produced. No more is required by any of the earlier cases.

Southwest contends, finally, that if depletion is allowed to the upland owners in this case, it would be difficult to limit the principle in instances of strangers "disassociated from the lease" who may have contributed an essential facility to the drilling operation in return for a share of the net profits. But those problems are not before us in this case where the upland owners could hardly be said

to be "disassociated from the lease." We decide only that where, in the circumstances of this case, a party essential to the drilling for and extraction of oil has made an indispensable contribution of the use of real property adjacent to the oil deposits in return for a share in the net profits from the production of oil, that party has an economic interest which entitles him to depletion on the income thus received.

For the foregoing reasons the judgment in No. 286, as to Southwest Exploration Company, is reversed and that in No. 287, as to Huntington Beach Company, is affirmed.

*No. 286, Reversed.*
*No. 287, Affirmed.*

MR. JUSTICE DOUGLAS dissents.

MR. JUSTICE HARLAN took no part in the consideration or decision of these cases.