**CBN CORPORATION (Formerly Columbian Carbon Company)**

v.

**The UNITED STATES.**

**No. 263–62.**

United States Court of Claims.
July 15, 1966.

Laramore, J., and Cowen, C. J., dissented.

Robert J. Casey, New York City, attorney of record, for plaintiff. Clark, Carr & Ellis; Thomas J. McCoy, Jr., Thomas E. Tyre, John A. Craig, New York City, and Harry J. Gerrity, Washington, D. C., of counsel.

Mitchell Samuelson, Washington, D. C., with whom was Asst. Atty. Gen. Mitchell Rogovin, for defendant. C. Moxley Featherston, Lyle M. Turner and Philip R. Miller, Washington, D. C., of counsel.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, and COLLINS, Judges.

DURFEE, Judge.

This is an action to recover an alleged overpayment of income taxes and interest for the years 1955 and 1956 in the amount of $274,562.75. The parties by joint stipulation have agreed that four of the six separate counts included in the petition, namely counts 2, 3, 4 and 6, are to be dismissed with prejudice.

These cross-motions for summary judgment pertain to the remaining counts—counts 1 and 5.

The issue before the court is whether plaintiff had a sufficient economic interest in natural gas in place to entitle it to participate in the depletion allowance for income tax purposes. This court in CBN Corporation v. United States, 328 F.2d 316, 164 Ct.Cl. 540 (1964) held that plaintiff, who before 1952 was a buyer of gas from Shamrock Oil Corporation, acquired an economic interest in the gas in place as a result of a 1952 agreement with Shamrock. The 1952 agreement relieved plaintiff of the obligation of buying gas from certain reserves of Shamrock (which gas plaintiff used either to produce carbon black or to sell to others) and instead, gave plaintiff a payment for the gas from the set-aside reserves sold by Shamrock to others. As a result of holding an economic interest, plaintiff was entitled to take the depletion allowance in computing its 1953 taxes. The facts in this case are the same as in the prior CBN case, supra. Only different tax years are involved.[1]

Plaintiff, therefore, maintains that the doctrine of collateral estoppel precludes defendant from opposing its summary judgment motion on grounds already litigated in the prior opinion.

Practically speaking, plaintiff's argument is that, since the facts and legal arguments of the prior CBN case and this case are identical, the court must render judgment for plaintiff.

Plaintiff's doctrinaire approach is based on the Supreme Court's approach to collateral estoppel as set forth in Commissioner v. Sunnen, 333 U.S. 591, 68 S.Ct. 715, 92 L.Ed. 898 (1948). There the Court stated at 597–598, 68 S.Ct. at 719:

\* \* \* where the second action between the same parties is upon a different cause or demand, the principle of *res judicata* is applied much more narrowly. In this situation, the judgment in the prior action operates as an estoppel, not as to matters which might have been litigated and determined, but "only as to those matters in issue or points controverted, upon the determination of which the finding or verdict was rendered." \* \* \* But matters which were actually litigated and determined in the first proceeding cannot later be relitigated. Once a party has fought out a matter in litigation with the other party, he cannot later renew that duel. In this sense, *res judicata* is usually and more accurately referred to as estoppel by judgment, or collateral estoppel. \* \*

---

1. The prior *CBN* case allowed recovery under §§ 23 and 114 of the 1939 Internal Revenue Code. 26 U.S.C. §§ 23 and 114 (1952 ed.). Since the tax years 1955 and 1956 are involved in the present litigation, we must look to the depletion laws contained in the 1954 Internal Revenue Code. Those sections (§§ 611 and 613) are substantially the same as their 1939 Code predecessors. Sections 611 and 613 of the 1954 Code, 26 U.S.C. §§ 611 and 613 (1964 ed.) read in relevant part as follows:

§ 611. Allowance of deduction for depletion.
(a) General rule.
  In the case of mines, oil and gas wells, \* \* \* there shall be allowed as a deduction in computing taxable income a reasonable allowance for depletion and for depreciation of improvements, \* \* \* such reasonable allowance in all cases to be made under regulations prescribed by the Secretary or his delegate. \* \* \*

§ 613. Percentage depletion.
(a) General rule.
  In the case of the mines, wells, and other natural deposits listed in subsection (b), the allowance for depletion under section 611 shall be the percentage, specified in subsection (b), of the gross income from the property excluding from such gross income an amount equal to any rents or royalties paid or incurred by the taxpayer in respect of the property. Such allowance shall not exceed 50 percent of the taxpayer's taxable income from the property \* \* \*.
(b) Percentage depletion rates.
  The mines, wells, and other natural deposits, and the percentages, referred to in subsection (a) are as follows:
  (1) 27½ percent—oil and gas wells.
  \*       \*       \*       \*       \*

It is the above quoted language which plaintiff uses as the foundation of its argument. The Supreme Court in *Sunnen,* supra, however, went on to further refine the rules for applying collateral estoppel. The Court stated at p. 599, 68 S.Ct. at p. 720:

But collateral estoppel is a doctrine capable of being applied so as to avoid an undue disparity in the impact of income tax liability. A taxpayer may secure a judicial determination of a particular tax matter, a matter which may recur without substantial variation for some years thereafter. But a subsequent modification of the significant facts *or a change or development in the controlling legal principles* may make that determination obsolete or erroneous, at least for future purposes. If such a determination is then perpetuated each succeeding year as to the taxpayer involved in the original litigation, he is accorded a tax treatment different from that given to other taxpayers in the same class. As a result, there are inequalities in the administration of the revenue laws, discriminatory distinctions in tax liability, and a fertile basis for litigious confusion. * * * [collateral estoppel] is not meant to create vested rights in decisions that have become obsolete or erroneous with time, thereby causing inequities among taxpayers. [Emphasis added.]

at 600, 68 S.Ct. at 720:

* * * As demonstrated by Blair v. Commissioner, 300 U.S. 5, 9, 57 S.Ct. 330, 331, 81 L.Ed. 465, a judicial declaration intervening between the two proceedings may so *change the legal atmosphere* as to render the rule of collateral estoppel inapplicable. * * * [Emphasis added.]

In regard to the aforementioned *change or development in controlling legal principles* or *change in the legal atmosphere* it has been stated that these standards do not mean that the earlier decision must have been overruled or that the second ruling be inconsistent with the first. The above italicized language means rather that the "second court should be freed from the prior determination if there has been some marked advance or alteration in relevant orientation, approach, reasoning, or principles." Hercules Powder Co. v. United States, 337 F.2d 643, 648, 167 Ct.Cl. 639, 649 (1964) (dissenting opinion). That such a marked alteration in approach to the problem at hand exists is evidenced by the recent decision of this court in Tidewater Oil Company v. United States, 339 F.2d 633, 168 Ct.Cl. 457 (1964). We held in *Tidewater* that transferors of oil "allowables" [2] in the East Texas Oil Field, who received royalties on each barrel of oil produced under the transferred allowables, did not have the requisite interest in the oil in place to enable them to qualify for depletion allowances. A comparison of the reasoning and approach used in the first *CBN* case and the *Tidewater* case lucidly underscores the change of course in our approach to depletion matters.

A bothersome point in the prior *CBN* case was the lack of a fee or leasehold interest by plaintiff in the oil-producing properties. Placing reliance on Commissioner v. Southwest Exploration Co., 350 U.S. 308, 76 S.Ct. 395, 100 L.Ed. 347 (1956), this Court stated at 328 F.2d 322, 164 Ct.Cl. 550: "It is not necessary that the holder of an economic interest have title to the property." However, in the later *Tidewater* case, this blanket rule was somewhat refined as follows:

* * * At the outset it should be noted that aside from *Southwest Exploration* no Supreme Court decision has found a taxpayer possessing the requisite interest in the mineral in place who did not have either a fee or

---

**2.** The Texas law limits the production from each oil well by assigning a monthly maximum production "allowable" to each well. If any well is shut down because of an excessive amount of salt water, the owner of that well may assign his oil "allowable" to another operator, who may then produce this additional amount of oil under his own oil lease.

a leasehold interest in the oil-producing property itself. This apparent departure from prior doctrine can best be explained on the grounds that the granting of discovery depletion in that case served the purposes for which the allowance was created. That is, the upland owners in that case contributed *real property* which was essential to the *discovery, drilling,* and *extraction* of the oil. * * * [339 F.2d at 638, 168 Ct.Cl. at 466—Emphasis in original.]

Thus, the holding of non-necessity of title or leasehold interest of *Southwest,* regarded as a blanket exception or break from precedent by the Court in *CBN,* was re-interpreted in *Tidewater* to be a variable; that is, the requirement of fee or leasehold *may* be disregarded *in certain instances* where its application would thwart the purposes for which depletion allowances were created. The necessity of title or leasehold rule was recognized to be an elastic one,—one that could be stretched in certain instances, as in *Southwest,* rather than one to be strictly adhered to or, conversely completely disregarded. That this is the correct interpretation is evidenced by the very limited holding by the Supreme Court itself in *Southwest* at. 350 U.S., 317, 76 S.Ct. 400:

> * * * We decide only that where, *in the circumstances of this case,* a party essential to the drilling for and extraction of oil has made an *indispensable contribution* of the use of real property adjacent to the oil deposits in return for a share in the net profits from the production of oil, that party has an economic interest * * * [Emphasis added.]

See also Paragon Jewel Coal Co. v. Commissioner, 380 U.S. 624, 637–638, 85 S.Ct. 1207, 14 L.Ed.2d 116 (1965).

The above quoted limited holding of *Southwest* refers to an *indispensable contribution* by the party seeking the depletion allowance. Footnote 5 of the prior *CBN* case refers to *Southwest* in the following manner, 328 F.2d at p. 323, 164 Ct.Cl. at p. 552:

> * * * The Court does mention in *Southwest* that the site furnished was essential to the drilling contract, but this was only one of the elements mentioned by the Supreme Court. We have seen no case that holds that a party must be essential to a drilling contract in order to have an economic interest. * * *

Compare, however, the approach used by the court in *Tidewater* when the court, in analyzing the facts, concluded that the transferors of allowables had not made an *indispensable contribution* to the use of the property:

> * * * Their [the transferors] contribution was personal property rather than real property; it was at best indispensable for the extraction of only part of the oil; it was not instrumental in the acquisition of the lease, *nor was it essential to the drilling operations.* * * * [339 F.2d at 639, 168 Ct.Cl. at 467—Emphasis added.]

This court in attempting to determine the meaning of the Supreme Court's language of "indispensable contribution" decided in *Tidewater,* upon further thought and consideration, that such language meant that a major factor in determining economic interest of one seeking depletion was the determination of whether or not that party was *essential* to the drilling operation (or extraction of minerals).[3] This court's understanding of *Southwest,* in the *Tidewater* case, was thereafter confirmed by the Supreme Court in Paragon Jewel Coal Co. v. Commissioner, supra, 380 U.S. at 637–

---

**3.** See a later decision of this court, Food Machinery and Chemical Corp. v. United States, 348 F.2d 921, 172 Ct.Cl. —— (1965) where we held that certain contributions of taxpayer (namely the construction of 4 electric furnaces worth $20,000,000.00) were *essential* to the mining of shale. The requisite of essentiality to the drilling or extraction operation seems now to be well established.

Plaintiff has relied on *Food Machinery* mainly for the proposition that the requirement of fee or leasehold is no longer

638, 85 S.Ct. 1207. Such reasoning represents a material alteration in approach to the overall depletion question from our reasoning in the prior *CBN* case.

■ Since, as we have shown, our approach to this type of case has changed considerably, we are free to consider anew the issue in this case on its merits. Immediately prior to 1952, Shamrock Oil and Gas Corporation was engaged in the production of natural gas from lands owned or leased by that company in Moore County, Texas. Under various agreements CBN and Shamrock had entered into a certain arrangement for the sale of gas to CBN. Under the agreements, Shamrock was responsible for bringing the natural gas to the surface. Shamrock then removed liquid hydrocarbons from the gas. After such removal, about 95 percent of the original or raw gas remained. (The remainder is sometimes referred to as residue gas). CBN, which operated a carbon black plant in the area, then had a right and obligation to purchase a certain amount of such residue gas from Shamrock. The amount that CBN had a right to purchase was a fractional part of the residue gas, which was referred to as "dedicated reserves." From these dedicated reserves there was to be available to CBN a minimum of 30 million cubic feet of gas per day. CBN was obligated to purchase the aforesaid minimum amount, and had first option to purchase other gas available from the reserves. CBN was also given the right to cease burning the gas at any time, in which event it could resell to other purchasers. In the latter event, different terms of paying Shamrock for the gas were provided. It is evident that under these arrangements CBN held no economic interest in the gas.[4] The test for economic interest is set out in Commissioner v. Southwest Exploration Co., supra, 350 U.S. at p. 314, 76 S.Ct. at p. 398:

> * * * a taxpayer is entitled to depletion where he has: (1) "acquired, by investment, any interest in the oil in place," and (2) secured by legal relationship "income derived from the extraction of the oil, to which he must look for a return of his capital." * *

Plaintiff did not qualify under part (1) of the above test since it held only an economic advantage, not an economic interest in the oil in place. Plaintiff was merely a purchaser of the gas.

Helvering v. Bankline Oil Co., 303 U.S. 362, 58 S.Ct. 616, 82 L.Ed. 897 (1938) authoritatively held that a mere purchaser is not entitled to depletion. In that case the taxpayer purchased the gas before removal of the hydrocarbons. Plaintiff in this case is further removed from the gas in place since its purchases were not made until after the hydrocarbons were removed.

We must now determine whether or not the 1952 contract between plaintiff and Shamrock so altered their relationship as to change plaintiff's interest from one of economic advantage to economic interest in the gas in place. Upon analysis of the contract, we think it does not.

By 1952 both parties desired to have a different arrangement of their agreement. Plaintiff wished to shut down its carbon black plant and to resell all of the gas bought from Shamrock. Shamrock, in turn, wished to sell the gas to another company at higher profits. Both parties

important in deciding depletion cases. However, as we have pointed out, the leasehold or fee rule is not a rigid one, and may be disregarded in instances when its application would subvert Congressional intent. *Food Machinery* was just such a situation. Plaintiff's economic interest in *Food Machinery* was so strong that the absence of a leasehold or fee interest could not divest plaintiff of depletion rights. In fact, we stated in *Food Machinery* that the facts in that case on the question of economic interest were *stronger* than in *Southwest*. The holding in *Food Machinery* was therefore no more than an adherence to the principles set out in *Southwest*.

4. Both the majority and dissenting opinions in the prior *CBN* case were in agreement with the fact that CBN Corporation had no economic interest in the oil in place prior to 1952.

then decided that it would be advantageous to arrange for the resale of all of the gas (including that volume . that plaintiff was obligated to purchase) by Shamrock in its own name. That this was the parties' intent is shown by the 4th, 5th and 6th paragraphs of the preamble to the 1952 contract which read in part as follows:

WHEREAS [CBN] has notified Shamrock of its intention to shut down its carbon plant * * * and * * * desires to effect a resale of the volumes of gas it is authorized to resell under the terms and provisions of the aforesaid contracts; [the pre-1952 agreements] and

WHEREAS * * * the conditions under which such volumes would be delivered and received would require an agreement or arrangement between Shamrock and the purchaser * * *; * * * the parties hereto having considered such matters, have concluded that it would be more economical and convenient to arrange for the resale of the aforesaid volumes to be made by Shamrock in its own name and on its responsibility as between the seller and purchaser of such gas and that an accounting between the parties hereto with respect to such resale volumes be made on a basis mutually satisfactory in lieu of the accounting between the parties required under the terms of the aforesaid contracts * * *; and

WHEREAS Shamrock is willing to release [CBN] from its obligation to purchase volumes of residue gas it is now obligated to purchase * * * and is willing to undertake to accomplish a resale of the volumes of residue gas which [CBN] is authorized to resell * * * in lieu of making delivery thereof to [CBN], and is will-

ing to make certain payments to [CBN] with respect to the volumes of residue gas remaining from gas produced from its sour gas reserves to the extent of the volumes which [CBN] would * * * be authorized to sell to others * * *.

The resulting agreement therefore merely transferred from plaintiff to Shamrock the right to sell for plaintiff part of the residue gas which plaintiff was required to purchase under the old contract (which volume plaintiff could resell under the old contract). Plaintiff's remuneration was to be a share of Shamrock's new higher, selling price. The transaction thus remained basically one of sale. Instead of CBN selling to others, Shamrock sold to others as CBN's agent. There was no change in status as between the parties. The respective interests of the parties to the contract were merely rearranged. Such a rearrangement surely could not transfer CBN's economic advantage to one of economic interest. CBN still lacked a property interest. The new contract did not give CBN a leasehold or fee in the land.[5] As we previously stated, the leasehold or fee rule may be disregarded in those instances where a rigid application would subvert Congressional intent. But we perceive no Congressional intent to allow a mere purchaser of oil, such as CBN, to gain an economic interest in oil in place.

Further, plaintiff's participation was not *essential* to the extraction of the gas. Shamrock could bring up and process the gas at will, without plaintiff's leave. As was stated in the dissenting opinion in the prior CBN case [328 F.2d, at 327, 164 Ct.Cl., at 558]:

* * * Taxpayer's concern did not begin with the raw gas as it came from the well. Nor did that concern even

5. There was a conflict of opinion in the prior case as to whether the 1952 agreement contained a covenant running with the land. Such an encumbrance is usually specified with particularity. Such was the case in the pre-1952 agreement(s). The 1952 agreement, however, contained an ordinary clause relating to assignment. Such a material change in form indicates a material change in agreement between the parties, i. e., the 1952 agreement was not meant to contain a covenant running with the land.

commence with the manufacture of *residue* gas. Just as in the pre-1953 period, taxpayer's concern only began with the *sale* by Shamrock of the residue gas. Prior to that stage, plaintiff had no connection with the mineral. Under the express provisions of the 1952 agreement, Shamrock could use the gas, without accounting to plaintiff in any way, for specified ends of its own—including use for fuel for compression purposes, for processing and production purposes, and for manufacturing steam. Not until the moment of sale did any obligation to plaintiff arise or plaintiff have any concern with the gas.[9] * * *

The element of essentiality has been thoroughly discussed in the first portion of this opinion. A further discussion of that principle is unnecessary. It suffices to say that no element of essentiality was present in plaintiff's relationship to the extraction of the gas. We hold that plaintiff does not possess the requisite interest in the gas in place to allow it to qualify for depletion allowance under the criteria established in *Southwest Exploration,* supra, or as later reinterpreted by this court in *Tidewater,* supra. The *Tidewater* approach and reasoning changed the legal climate in this area to such a degree as to dictate the present result. The rigidity of collateral estoppel cannot apply in this instance.

Plaintiff's motion for summary judgment is denied, while defendant's cross-motion for summary judgment is granted. The petition is dismissed, according to the stipulation of the parties and this opinion.

LARAMORE, Judge (dissenting):

I respectfully dissent. Tidewater Oil Company v. United States, relied upon by the majority as showing a change in the legal climate, arose under a different contract and involved different facts. The facts in this case are in all respects identical to the facts in the prior *CBN Corporation* case and only encompass different tax years. I think the decision in *Tidewater* has not effected a sufficient change in the legal climate to warrant our departure from the doctrine of collateral estoppel. I would, therefore, permit recovery by plaintiff.

COWEN, Chief Judge, joins in the foregoing dissent.

9. The contract provided:
"4. There shall be no restriction nor limitation on Shamrock's right to remove liquid or liquefiable hydrocarbons or hydrogen sulphide from the gas produced from said reserves and there shall be no obligation, express or implied, on Shamrock's part to make payments to Columbian [plaintiff] on the proportionate part of said residue gas above specified, except as, if and when such residue gas is sold or used by Shamrock for purposes other than specified in subparagraphs (a), (b), (c) and (d) of Section 3 above; provided that if Shamrock should cease to process through its plant or plants the gas produced from its sour gas reserves, or any part thereof, and shall make sale thereof at the well or wells where produced, then such payments shall be applicable to the proportionate part of the raw gas volumes that may be sold by Shamrock." [328 F.2d p. 327, 164 Ct.Cl. p. 558—footnote 9]