Sylvan C. COLEMAN, Trustee for the Stockholders of United Carbon Company in Dissolution, and Ashland Oil & Refining Company

v.

The UNITED STATES.

No. 54–64.

United States Court of Claims.

Dec. 15, 1967.

William M. Ryan, Washington, D. C., attorney of record, for plaintiffs. Royal J. Voegeli, Washington, D. C., Thomas J. Brorby, and Fulbright, Crooker, Freeman, Bates & Jaworski, Houston, Tex., of counsel.

Joseph Kovner, Washington, D. C., with whom was Asst. Atty. Gen. Mitchell Rogovin, for defendant. Philip R. Miller and Mitchell Samuelson, Washington, D. C., of counsel.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON, and NICHOLS, Judges.

OPINION

PER CURIAM.

This case was referred to Trial Commissioner Mastin G. White with directions to make findings of fact and recommendation for conclusions of law. The commissioner has done so in an opinion and report filed on January 11, 1967. Plaintiffs excepted to the commissioner's recommended conclusion of law but made no exceptions to his findings of fact. The case has been submitted to the court on oral argument of counsel and the briefs of the parties. Since the court agrees with the commissioner's findings, opinion, and recommended conclusion of law, with minor modifications, it here hereby adopts the same as modified as the basis for its judgment in this case.* Plain-

---

* The concurring opinion of LARAMORE, Judge, and the dissenting opinion of SKELTON, Judge, follow the opinion of . the Trial Commissioner which has been adopted by the court.

tiffs are, therefore, not entitled to recover and the petition is dismissed.

Commissioner White's opinion,** as modified by the court, is as follows:

The plaintiffs are suing for the recovery of income taxes paid by a predecessor in interest, the United Carbon Company, Inc. (Maryland), for the calendar year 1953. (For the sake of convenience, the United Carbon Company, Inc. (Maryland), will usually be referred to hereafter in the opinion as "the taxpayer.")

The facts of this case are similar, in all significant respects, to those that were before the court in CBN Corporation v. United States, 328 F.2d 316, 164 Ct.Cl. 540 (1964), and in CBN Corporation v. United States, 364 F.2d 393, 176 Ct.Cl. 861 (1966), cert. denied, 386 U.S. 981, 87 S.Ct. 1284, 18 L.Ed.2d 228 (1967). Accordingly, this case presents to the court again, for a third determination, the same percentage depletion problem which the court passed upon, with diverse results, in the two *CBN* cases.

The events that led up to the two *CBN* cases and to the present litigation really began in October 1935. At that time, The Shamrock Oil and Gas Corporation (referred to hereafter in the opinion as "Shamrock") was engaged in the production of natural gas from lands owned or leased by Shamrock in Moore County, Texas, and in the extraction of the heavier liquid or liquefiable hydrocarbons from the natural gas. The extraction process was performed at a plant which Shamrock operated in Moore County, Texas, and which was known as the McKee Plant. The natural gas that remained after going through the extraction process was known as "residue gas."

On October 1, 1935, Shamrock entered into similar gas sales agreements with two companies that were engaged in the manufacture of carbon black through the burning of natural gas. One of these companies was the Reliance Carbon Company, Inc. (referred to hereafter in the opinion as "Reliance"), and the other was the Western Carbon Company. Reliance was the predecessor in interest of the taxpayer and, therefore, of the present plaintiffs. The Western Carbon Company was the predecessor in interest of the CBN Corporation.

The term of the October 1, 1935 gas sales agreement between Shamrock and Reliance was for the entire life of Shamrock's natural gas reserves in Moore County, Texas. Under the agreement, Reliance agreed to construct, in the vicinity of Shamrock's McKee Plant, a plant for the manufacture of carbon black that would have a capacity to handle a minimum of 30,000,000 cubic feet of natural gas per day. The agreement also provided that Shamrock would sell to Reliance, and that the latter would purchase from Shamrock, a daily minimum of 30,000,000 cubic feet of residue gas (i. e., natural gas from which the liquid or liquefiable hydrocarbons had been removed by Shamrock).

It was the understanding between Shamrock and Reliance that the gas delivered to Reliance under the October 1, 1935 agreement would be burned by Reliance in the manufacture of carbon black, and Reliance was to pay for the gas by delivering to Shamrock 30 percent of the carbon black manufactured at Reliance's plant. However, the October 1, 1935 agreement contained a provision stating that Reliance had the right, at any time, to cease burning in the manufacture of carbon black all or any part of the residue gas purchased from Shamrock and to resell such gas, in which event Shamrock was to receive from Reliance a minimum of 2 cents per Mcf on the gas thus resold, plus 50 percent of any amount by which the resale price exceeded 2 cents per Mcf.

The gas sales agreement which Shamrock entered into on October 1, 1935 with the Western Carbon Company (the CBN Corporation's predecessor in interest) was virtually identical with the gas sales agreement of the same date between Shamrock and Reliance (predecessor in

---

** The opinion, findings of fact, and recommended conclusion of law are submitted under the order of reference and Rule 57(a).

interest of the taxpayer and of the present plaintiffs), as previously summarized in this opinion.

In connection with the gas sales agreements of October 1, 1935 between Shamrock and Reliance, and between Shamrock and the Western Carbon Company, the three companies—Shamrock, Reliance, and the Western Carbon Company—entered into a subsidiary agreement that was also dated October 1, 1935. In this subsidiary agreement, Shamrock granted to Reliance and to the Western Carbon Company "the first right, in priority to all other uses or dispositions of its natural gas made by * * * [Shamrock] in twelve thousand (12,000) acres of gas territory owned or controlled by * * * [Shamrock] and located in Moore County, Texas." The subsidiary agreement further provided (among other things) that "All rights and obligations hereunder shall extend to and be binding upon the parties hereto, their successors and assigns."

Subsequent to the making on October 1, 1935 of the agreements previously mentioned, Reliance and the Western Carbon Company constructed carbon black plants in Moore County, Texas, and in the general vicinity of Shamrock's McKee Plant. Each carbon black plant had a capacity sufficient to handle a minimum of 30,000,000 cubic feet of natural gas per day. Reliance's plant was constructed at a cost of approximately $890,000.

By means of an agreement dated November 19, 1946 between Shamrock and the taxpayer—which had succeeded in the meantime to the rights of Reliance under the gas sales agreement of October 1, 1935 between Shamrock and Reliance and under the tripartite agreement of the same date involving Shamrock, Reliance, and the Western Carbon Company— Shamrock agreed to "increase the acreage reserves from which the Buyer [the taxpayer] has the prior right to purchase and receive gas under the Gas Sales Agreement dated October 1, 1935, by an additional amount of 2,170 acres * * *." In addition, the agreement of November 19, 1946 between Shamrock and the tax-

payer amended the gas sales agreement of October 1, 1935 so as to provide that the taxpayer would pay a fixed price per Mcf for the gas delivered by Shamrock after January 1, 1946 and burned by the taxpayer in the manufacture of carbon black (the price was to be 2.435 cents per Mcf as of January 1, 1946, and was to increase gradually to 5.5 cents per Mcf as of January 1, 1958), and by providing that the taxpayer would pay Shamrock a minimum of 3 cents per Mcf, instead of 2 cents on any gas which the taxpayer resold instead of burning it in the manufacture of carbon black.

An agreement similar to the one summarized in the preceding paragraph was entered into on November 11, 1946 between Shamrock and the CBN Corporation, which had succeeded to the rights of the Western Carbon Company under that company's agreement of October 1, 1935 with Shamrock, and under the tripartite agreement of the same date involving Shamrock, Reliance, and the Western Carbon Company.

Further amendatory agreements were later entered into between Shamrock and the taxpayer. Under the agreements between these two companies, as the agreements existed in the fall of 1952 pursuant to the several amendments, the taxpayer had the prior right to purchase from Shamrock 8,170/62,625ths of the residue gas resulting from the recovery of liquid or liquefiable hydrocarbons in two plants that were then being operated by Shamrock in Moore County, Texas (the second plant was known as the Sunray Plant), and such fractional part of the residue gas was declared to be the "dedicated reserves" of the taxpayer (although the taxpayer was not obligated to purchase more than 28,000,000 cubic feet of residue gas per day, if more than that amount was available under the formula and the taxpayer did not wish to purchase the extra quantity); and the taxpayer had the right, at any time, to cease burning in the manufacture of carbon black, and to resell, 6,000/62,625ths of the residue gas resulting from Sham-

rock's processing operations in Moore County, Texas.

In the fall of 1952, the taxpayer gave notice to Shamrock that it intended to shut down its carbon black plant; that it wished to be relieved of the necessity of purchasing the volumes of residue gas which it was required to purchase under the gas sales agreement of October 1, 1935, as amended, between the parties but which it did not have the right to resell; and that it desired to effect a resale of the volumes of residue gas that it was authorized to resell under the terms and provisions of the gas sales agreement of October 1, 1935, as amended.

Thereafter, on October 15, 1952, Shamrock negotiated a contract which was to be effective on September 1, 1953 and which provided for the sale of Shamrock's residue gas to the Northern Natural Gas Company. The price which Shamrock was to receive from the Northern Natural Gas Company was much more favorable (it was to begin at 10.5 cents per Mcf as of September 1, 1953, and was to increase to 11.5 cents as of January 1, 1958 and to 12.5 cents as of January 1, 1963) than the price which Shamrock had been receiving from the taxpayer under the gas sales agreement of October 1, 1935, as amended.

On November 19, 1952, Shamrock and the taxpayer entered into an agreement that was to supersede and terminate the prior agreements between the parties. The new agreement was originally scheduled to be effective on September 1, 1953, but the effective date was later advanced to January 1, 1953. The new agreement, after January 1, 1953, was wholly to control the rights, duties, and obligations of the parties. The new agreement no longer continued in existence the prior arrangement between the parties, whereby Shamrock was obligated to sell to the taxpayer, and the latter was obligated to purchase, residue gas resulting from the processing operations in Shamrock's plants located in Moore County, Texas. Under the new agreement, Shamrock had the right to sell to other persons, on its own initiative, all the residue gas resulting from the processing operations in its Moore County, Texas, plants. However, Shamrock agreed to pay the taxpayer 6 cents per Mcf on 6,000/62,625ths of the residue gas remaining after the removal of the liquid or liquefiable hydrocarbons in Shamrock's Moore County, Texas, plants.

A new agreement, similar to the one summarized in the preceding paragraph, was also entered into between Shamrock and the CBN Corporation on November 19, 1952 and became effective on January 1, 1953.

Pursuant to the new agreement of November 19, 1952 between Shamrock and the taxpayer, payments in the total amount of $207,948 from Shamrock accrued to the taxpayer during the calendar year 1953.

In its income tax return for 1953, the taxpayer reported as ordinary income, and did not claim any deduction for percentage depletion with respect to, the $207,948 received from Shamrock in 1953, as indicated in the preceding paragraph. Subsequently, however, a timely claim for refund was filed by the taxpayer, on the ground that it was entitled to a deduction in the amount of $57,185.76 for percentage depletion, under Sections 23(m) and 114(b)(3) of the Internal Revenue Code of 1939, with respect to the payments received from Shamrock in 1953 under the agreement of November 19, 1952. The refund claim was subsequently amended so as to assert, in the alternative, that if the payments which Shamrock made to the taxpayer in 1953 under the agreement of November 19, 1952 were not subject to percentage depletion, such payments should be treated as gross income from the sale of a capital asset or property used in the trade or business and held for more than 6 months, and, therefore, should receive long-term capital gain treatment under subsections (a) and (j) of Section 117 of the 1939 Code.

The taxpayer's refund claim, as amended, was disallowed by the Internal Revenue Service on March 24, 1961.

On February 19, 1963, the taxpayer and two other corporations were merged into the United Carbon Company. The next day, a plan for the complete liquidation of the United Carbon Company was adopted by its stockholders. Pursuant to such plan, substantially all the assets of the United Carbon Company that could legally be transferred were sold on February 28, 1963 to the Ashland Oil & Refining Company and others. In connection with the sale of assets to the Ashland Oil & Refining Company, the United Carbon Company agreed to transfer to Ashland any proceeds that might be received on the taxpayer's income tax claim against the United States for 1953.

The United Carbon Company was dissolved on December 31, 1963. Sylvan C. Coleman was subsequently appointed to serve as trustee for the stockholders of the dissolved corporation, with the right to prosecute the income tax claim for 1953 previously asserted by the taxpayer against the United States.

Sylvan C. Coleman, as trustee, and the Ashland Oil & Refining Company filed the present suit on February 27, 1964.

In the first *CBN* case (328 F.2d 316, 164 Ct.Cl. 540), this court was called upon to decide whether the CBN Corporation, in connection with the amounts which it received from Shamrock during 1953 under the agreement of November 19, 1952 between Shamrock and the CBN Corporation, was entitled to take the deduction for percentage depletion authorized by Sections 23(m) and 114(b)(3) of the 1939 Code. This turned upon the ultimate question of whether the CBN Corporation, under its agreement of November 19, 1952 with Shamrock, had an economic interest in the gas in place. Commissioner of Internal Revenue v. Southwest Exploration Co., 350 U.S. 308, 316, 76 S.Ct. 395, 100 L.Ed. 347 (1956). A divided court answered this question in the affirmative. The court said (328 F.2d at page 321, 164 Ct.Cl. at page 549) that although under the earlier agreements with Shamrock the CBN Corporation "was nothing more than a purchaser with certain priority rights of purchase,"

the CBN Corporation's position was changed by the agreement of November 19, 1952, since the payments received by the CBN Corporation under that agreement were "equivalent to royalty payments on its designated percentage of all gas produced, used or sold from the acreage designated in the new contract," and the CBN Corporation under the new contract "was in the position of any holder of royalty interest in the proceeds of oil or gas production." Accordingly, the court held that the CBN Corporation had an economic interest in the gas in place under the agreement of November 19, 1952 between Shamrock and the CBN Corporation, and that the CBN Corporation was entitled to take a deduction for percentage depletion with respect to the amounts received from Shamrock during 1953 under that agreement.

The second *CBN* case (364 F.2d 393, 176 Ct.Cl. 861) involved the question of the CBN Corporation's entitlement to deductions for percentage depletion on amounts received from Shamrock during 1955 and 1956 under the agreement of November 19, 1952 between Shamrock and the CBN Corporation. In the meantime, the Internal Revenue Code of 1939 had been superseded by the Internal Revenue Code of 1954, but the provisions of the 1954 Code dealing with the allowance of a deduction for depletion with respect to oil and gas wells (Sections 611(a) and 613(a) and (b)(1)) were basically the same as the provisions of the 1939 Code covering the same subject. In the second *CBN* case, the court again divided, but this time the majority held that the CBN Corporation, under the November 19, 1952 agreement between Shamrock and the CBN Corporation, did not have an economic interest in the gas in place, and, therefore, that the CBN Corporation was not entitled to take a deduction for percentage depletion with respect to the amounts which it received in 1955 and 1956 from Shamrock under the November 19, 1952 agreement. The court noted (364 F.2d at page 399, 176 Ct.Cl. at page 871) that the November 19, 1952 agreement "did not give CBN a leasehold or fee in the land," and "Further, plaintiff's

participation was not *essential* to the extraction of the gas," since "Shamrock could bring up and process the gas at will, without plaintiff's leave."

In the present case, with respect to the matter of entitlement to a deduction for percentage depletion, the situation of the taxpayer (predecessor of the plaintiffs) was precisely the same as that of the CBN Corporation in each of the two cases previously mentioned. This case involves amounts which the taxpayer received in 1953 from Shamrock under an agreement which was dated November 19, 1952 and which was virtually identical with the agreement of the same date between Shamrock and the CBN Corporation, discussed by the court in the two CBN cases.

If, as the court held in its latest expression of opinion concerning the tax consequences incident to the agreement of November 19, 1952 between the CBN Corporation and Shamrock, the CBN Corporation did not have an economic interest in the gas in place, and the amounts received from Shamrock under that agreement were not subject to percentage depletion, it necessarily follows that the taxpayer similarly had no economic interest in the gas in place under the November 19, 1952 agreement between the taxpayer and Shamrock, and, accordingly, the taxpayer was not entitled to take a deduction for percentage depletion with respect to the amounts which it received from Shamrock in 1953 under such agreement.[1]

However, the plaintiffs make the alternative contention that if the payments which Shamrock made to the taxpayer, their predecessor, in 1953 under the agreement of November 19, 1952 were not subject to percentage depletion, such payments should have received long-term capital gain treatment under Section 117 (a)(4) of the 1939 Code as proceeds derived from the sale or exchange of a capital asset held for more than 6 months, instead of being taxed as ordinary income.

In connection with the plaintiffs' alternative contention, the primary question requiring consideration is whether the taxpayer's contractual rights under the gas sales agreement of October 1, 1935, as amended, between the taxpayer and Shamrock, which the taxpayer disposed of in the transaction of November 19, 1952 between the taxpayer and Shamrock, constituted "a capital asset." If the primary question is answered in the affirmative, it will then be necessary to consider the further question of whether the transaction of November 19, 1952 between the taxpayer and Shamrock involved a "sale or exchange" of the taxpayer's contractual rights under the gas sales agreement of October 1, 1935, as amended.

The circumstances under which contractual rights constitute a capital asset for capital gain purposes were thoroughly reviewed in the case of Commissioner of Internal Revenue v. Ferrer, 304 F.2d 125 (2nd Cir. 1962).[2] After analyzing the cases in which proceeds from dispositions of contractual rights had been held to

---

1. Plaintiffs say that in the *CBN* cases this court was not apprised that the Texas conservation laws, in 1935, made the carbon black plants esssential to the production of the gas and therefore gave plaintiffs' predecessor an economic interest in the gas in place under the doctrine of Commissioner of Internal Revenue v. Southwest Exploration Co., supra. The Fifth Circuit has rejected this contention, holding that the state conservation laws did not prevent the sale or marketing of the gas, and in effect that carbon black plants were not essential to pro-

duction. Scofield v. La Gloria Oil & Gas Co., 268 F.2d 699, 708 (5th Cir., 1959), cert. denied, 361 U.S. 933, 80 S.Ct. 372, 4 L.Ed.2d 355 (1960) ; Shamrock Oil & Gas Corp. v. Commissioner of Internal Revenue, 346 F.2d 377, 379–380 (5th Cir., 1965), cert. denied, 382 U.S. 892, 86 S. Ct. 185, 15 L.Ed.2d 149. There is no reason to disagree with the Fifth Circuit.

2. For a discussion of the case, see Eustice, Contract Rights, Capital Gain, and Assignment of Income—the Ferrer Case, 20 Tax L.Rev. 1 (1964).

merit capital gain treatment, the court said (at page 130):

One common characteristic of the group held to come within the capital gain provision is that the taxpayer had either what might be called an "estate" in * * *, or an "encumbrance" on * * *, or an option to acquire an interest in * * *, property which, if itself held, would be a capital asset. In all these cases the taxpayer had something more than an opportunity, afforded by contract, to obtain periodic receipts of income * * *.

In our case, the contractual rights which the taxpayer disposed of in the transaction of November 19, 1952 were, first, the right to purchase residue gas from Shamrock on a priority basis under the gas sales agreement of October 1, 1935, as amended, and, second, the right to burn the entire quantity of purchased gas in the manufacture of carbon black, or to use a portion of such gas for the manufacture of carbon black and resell another portion to third persons if this seemed advantageous to the taxpayer. In other words, what the taxpayer had was "a naked contract right" to purchase gas and thereafter to process or resell the gas, thereby obtaining periodic receipts of ordinary income. Cf. Commissioner of Internal Revenue v. Pittston Company, 252 F.2d 344, 348 (2nd Cir. 1958), cert. den. 357 U.S. 919, 78 S.Ct. 1360, 2 L.Ed. 2d 1364 (1958).

Even in the first CBN case, where a majority of the court held that the CBN Corporation had an economic interest in the gas in place under the new agreement of November 19, 1952 between Shamrock and the CBN Corporation, the court said that under the previous gas sales agreement of October 1, 1935, as amended, between those parties, the CBN Corporation "was nothing more than a purchaser with certain priority rights of purchase" (328 F.2d at page 321, 164 Ct.Cl. at page 549). The contractual rights of the present taxpayer under the gas sales agreement of October 1, 1935, as amended, between Shamrock and the taxpayer were exactly the same, in all substantial respects, as

the rights of the CBN Corporation under the similar gas sales agreement of October 1, 1935, as amended, to which the CBN Corporation was a party. Therefore, under the pronouncements by the court in both the first CBN case and the second CBN case, the taxpayer did not have any interest in the gas itself, prior to delivery by Shamrock, under the gas sales agreement of October 1, 1935, as amended.

Accordingly, since the gas sales agreement of October 1, 1935, as amended, between the taxpayer and Shamrock merely conferred on the taxpayer "a naked contract right" to purchase gas and use it or resell it as a means of obtaining periodic receipts of ordinary income, and did not vest in the taxpayer an interest in property, the disposition of such right in the transaction of November 19, 1952 between Shamrock and the taxpayer did not involve the disposition by the taxpayer of a capital asset.

The conclusion stated in the preceding paragraph makes it unnecessary to consider whether the transaction of November 19, 1952 amounted to a "sale or exchange."

For the reasons previously outlined, it appears that the plaintiffs are not entitled to recover either under their principal theory or under their alternative theory, and that the petition should be dismissed.

LARAMORE, Judge (concurring):

In the original CBN case I concurred in the majority opinion. The argument in the second CBN case convinced me that I was in error in the first concurrence. However, I was of the opinion that collateral estoppel prevented the defendant from prevailing. Since no such question is present in this case, I concur in the majority opinion.

SKELTON, Judge (dissenting):

I respectfully dissent from the opinion of the majority in this case. The identical facts involved here have been before this court in two other cases in the past, namely, CBN Corp. v. United States, 328

F.2d 316, 164 Ct.Cl. 540 (1964) and CBN Corp. v. United States, 364 F.2d 393, 176 Ct.Cl. 861 (1966), cert. denied, 386 U.S. 981, 87 S.Ct. 1284, 18 L.Ed.2d 228 (1967). In the first *CBN* case, this court held in a well-reasoned opinion that the taxpayer had an economic interest in the gas in place by reason of the agreement of November 19, 1952, between Shamrock Oil and Gas Corporation, hereinafter called Shamrock, and the taxpayer, and, accordingly, the taxpayer was entitled to take a deduction for percentage depletion with respect to the amounts received from Shamrock from the production and sale of gas under the agreement during the taxable year in question. I think that opinion was correct for all of the reasons stated in the opinion, and I adopt such reasons along with the discussion in the following paragraphs as the basis for my dissent in this case.

In the second *CBN* case, this court reversed its position and held that the taxpayer did not have an economic interest in the gas in place and was not entitled to the depletion allowance. The opinion of the commissioner in the instant case, which is adopted by this court as a *per curiam* opinion, is based entirely on the assumption that the second *CBN* opinion is correct as to the depletion aspect of the case for all of the reasons stated in that opinion. Therefore, the second *CBN* opinion is, for all practical purposes, the opinion of this court on the depletion allowance question in the case at bar, as no additional reasons are given in its *per curiam* opinion for denying the taxpayer the depletion allowance.

In my opinion, the second *CBN* decision was wrong for a number of reasons. The court fell into error in holding that the 1952 agreement did not change the status of the parties because it merely rearranged their respective interests. The facts indicate that the contrary is true. The 1952 contract completely terminates the old agreement and creates an entirely new and different relationship between the parties. In this regard, paragraph 1 of the 1952 agreement specifically provides:

1. Effective September 1, 1953, the aforesaid agreements and contracts (i. e., those of 1935 as amended) * * *shall be terminated and be and become of no further force and effect, except as to final accounting * * * prior to September 1, 1953, and *thereafter this contract* and the provisions hereof *shall fully control* the rights, duties and obligations of the parties hereto * * *. [Emphasis supplied.]

The court also erred in holding that the 1952 agreement remained basically one of sale (with the taxpayer having only the right to purchase the gas). The opposite is shown by the contract itself. Under the 1952 agreement, the taxpayer had no right to purchase, could not purchase, and did not purchase a single cubic foot of gas from Shamrock. It released all rights of purchase it had under the 1935 contracts to Shamrock. In return, Shamrock agreed to pay the taxpayer six cents per one thousand cubic feet on 6,000/62,625ths of the volumes of residue gas it produced and sold from the lands specifically described in Schedule A attached to the 1952 agreement, during the life of its gas leases on such property. This payment was to be made to the taxpayer whether the gas was produced and sold at the well or wells as raw gas or processed through Shamrock's plant. Paragraph 5 of the agreement provides that Shamrock warrants the title to all gas it may produce and sell and agrees to indemnify the taxpayer with respect to the gas so produced and sold.

This agreement shows clearly it was not a purchase and sale agreement of produced gas as between Shamrock and the taxpayer. The taxpayer had no right to buy any gas produced by Shamrock from its wells and Shamrock had no obligation to sell any of such gas to the taxpayer. This is a complete reversal of the 1935 contract, and establishes an entirely new relationship between the parties.

The court held that the new contract did not give the taxpayer a leasehold or fee in the land. While I do not think this is necessary in order for the taxpayer to have an economic interest in the gas in

place, I am of the opinion that the 1952 agreement amounted to an assignment of a portion of the mineral interest of Shamrock. It at least transferred an equitable title to the taxpayer of the interest assigned to it. Shamrock could not sell the gas nor the 7/8 working interest which it acquired from the owner of the land by its leases without accounting to the taxpayer for its share of the mineral interest. In other words, Shamrock's title to the 7/8 mineral interest in the lands was clouded to the extent of the assignment to the taxpayer of an interest in 6,000/62,625ths of the 7/8 interest of Shamrock in the volumes of residue gas in and under the land covered by its leases.

The basic question here is whether the taxpayer had an economic interest in the gas in place. The Supreme Court said in Palmer v. Bender, 287 U.S. 551, 556, 53 S.Ct. 225, 226, 77 L.Ed. 489 (1933), that:

> * * * The allowance to the taxpayer is not restricted by the words of the statute to cases of any particular class or to any special form of legal interest in the oil well. * * *

The court in that case laid down the test or requirement as follows:

> * * * The language of the statute is broad enough to provide, at least, for every case in which the taxpayer has acquired, by investment, any interest in the oil in place, and secures, by any form of legal relationship, income derived from the extraction of the oil, to which he must look for the return of his capital. Id. at 557, 53 S.Ct. at 226.

These requirements were again approved by the Supreme Court in Commissioner of Internal Revenue v. Southwest Exploration Co., 350 U.S. 308, 76 S.Ct. 395, 100 L.Ed. 347 (1956).

In my opinion, the taxpayer has met all of these requirements in this case. Whether it owned the leasehold or royalty is beside the point. As stated in Burton-Sutton Oil Co. v. Commissioner,

328 U.S. 25, 32, 66 S.Ct. 861, 90 L.Ed. 1062 (1946):

> * * * We do not agree * * * that ownership of a royalty or other economic interest in addition to the right to net profits is essential to make the possessor of a right to a share of the net profit the owner of an economic interest in the oil in place.

> * * * Whether the instrument creating the rights is a lease, a sublease or an assignment has not been deemed significant from the federal tax viewpoint in determining whether or not the taxpayer had an economic interest in the oil in place.

> * * * It is not material whether the payment * * * is in oil or in cash which is the proceeds of the oil, Helvering v. Twin Bell Syndicate, 293 U.S. 312, 321, [55 S.Ct. 174, 79 L.Ed. 383,] nor that some of the payments were in the form of a bonus for the contract. Id. at 33, 66 S.Ct. at 866.

> * * * Depletion depends only upon production. It is the lessor's, lessee's or transferee's "possibility of profit" from the use of his rights over production, "dependent solely upon the extraction and sale of the oil" which marks an economic interest in the oil. Id., at 34–35, 66 S.Ct. at 866–867.

The interest of the taxpayer in the gas in place here meets all these requirements.

An economic interest in minerals in place exists when one or more of the following situations exist, as is pointed out by Professor Sneed in *The Economic Interest—An Expanding Concept* in 35 Texas Law Review 307, 335 (1957):

> (1) When the taxpayer has legal or equitable ownership of the minerals in place.

> (2) When his control and beneficial enjoyment of the income from the mineral deposit are such as to warrant considering him the substantial owner, in the tax sense, of a part or the whole thereof. The duration of this enjoyment is relevant.

(3) When permitting depletion on the income from the interest would serve the purposes for which the allowance was created. The taxpayer's contribution to discovery, development or operation is relevant.

In my opinion, the taxpayer qualifies in the instant case for the depletion allowance under the first two of these situations, and perhaps under the third, as well. This court based its second *CBN* decision, and now its decision here, on a phase or tangential refinement of the third situation, namely, the court-created doctrine of "essentiality" of the efforts or acts of the taxpayer as a contribution to the extraction of the mineral. It is by this doctrine that the courts can grant or deny the allowance according to the will of the court rather than according to the will of Congress. It is unfortunate that the court, and perhaps the parties as well, appeared to lose sight of the main issues and principles in this case by becoming enmeshed in the arguments and discussions of "essentiality." After all, this is only one small part of the case and is not the only way a taxpayer can have an economic interest in the minerals in place.

It is my view that the taxpayer in this case met the requirements of Palmer v. Bender, supra, and Commissioner of Internal Revenue v. Southwest Exploration Co., supra, by acquiring by investment an interest in the gas in place, and by securing by legal relationship income derived from the extraction of the gas, to which it must look for a return of its capital. The tax refund sought here is based entirely on revenues derived from the interest of the taxpayer in gas produced and sold by Shamrock to third parties. None of the gas was purchased by the taxpayer.

I would enter judgment for the plaintiff by allowing it the depletion allowance claimed.

I do not reach the capital assets—long term capital gain claim of the plaintiff.

COLLINS, Judge, took no part in the decision of this case.