Arthur S. BRINKLEY, Jr.
and
Elizabeth P. Brinkley
v.
UNITED STATES of America.

Civ. A. No. 664-70-R.

United States District Court,
E. D. Virginia,
Richmond Division.

April 14, 1972.

Melvin Wallinger, Richmond, Va., for plaintiffs.

David G. Lowe, Asst. U. S. Atty., Richmond, Va., for defendant Helen Marmoll, Dept. Justice, Tax Section, Washington, D. C.

## MEMORANDUM

MERHIGE, District Judge.

This matter comes before the Court on the complaint of plaintiffs who seek a refund of what they allege to be a wrongful assessment of taxes for the calendar years 1966 and 1967.

Plaintiffs, husband and wife, are residents of the County of Henrico, Virginia, and filed timely income tax returns at Richmond, Virginia. Jurisdiction of the Court is founded on 28 U.S.C. § 1346(a) (1). All factual matters have been fully stipulated. The Court finds as follows:

This controversy arose by reason of the Commissioner of Internal Revenue determining upon audit that certain

funds reported on plaintiffs' joint returns for the years 1966 and 1967 were reported as long term capital gains, and in the Commissioner's opinion should have been reported as ordinary income subject to depletion. Upon that determination, plaintiffs were assessed deficiencies aggregating $9,202.42, including interest, which was paid by plaintiffs on June 8, 1969, followed by claims on the part of the plaintiffs for refund which were subsequently disallowed, giving rise to this action.

Elizabeth P. Brinkley is a party to the action only by reason of her having joined in the joint returns filed for the years in question.

On August 25, 1956, the plaintiff Arthur S. Brinkley, Jr. entered into a contract with the Odessey Corporation of Texas, by virtue of which Odessey acquired an undivided one fourth interest in the mineral rights then owned in fee simply by Brinkley in certain Texas oil producing properties located in Stonewall County of that state.

The issue before the Court relates solely to the funds received by the plaintiffs in 1966 and 1967 pursuant to the contract and related documents as between Brinkley and Odessey. It is Brinkley's position that such funds are appropriately classified as deferred purchase money taxable at capital gains rates, while the Government's position is that the funds are payments based on mineral production and taxable at ordinary income rates.

Prior to entering into the agreement with Odessey, Brinkley had negotiated with other prospective purchasers in reference to a transfer of an undivided one fourth interest in the mineral rights involved herein. Subsequent to negotiations with one Karl B. Rodi of Los Angeles, the Odessey Corporation of Texas was formed and a formal contract entered into between it and Brinkley. There is no question but that the transaction between Brinkley and Odessey was an arms length one and was consummated by virtue of the execution of a contract, a conveyance instrument, a note and a deed of trust. Pursuant to the contract, Brinkley transferred to Odessey an undivided, fully participating, perpetual one fourth interest in and to the oil, gas and other minerals in, on and under and that might be produced from the Stonewall County properties, for which there was to be an aggregate payable sum of $850,000, $80,000 of which was payable at the time of the issue of the contract, $60,000 was to be paid in monthly installments during the first year of the contract, $200,000 in monthly installments the following four years, and the remaining sum of $510,000 was to be paid (a) in monthly payments in every year thereafter equal to $3,333.33 or 65% of gross receipts, whichever is less; and (b) annual payments equal to 90% of gross receipts from mineral production over and above a certain volume. No interest was assigned to the payments aforementioned, although the note in the amount of $770,000 given at the time of the closing of the transaction provides for interest at 6% on all past due amounts. It should be noted that the conveyance instrument, the note, and the deed of trust all contain identical provisions for payment. Paragraph 20 of the contract between the parties provides that:

> Notwithstanding the foregoing, no successor in interest of Second Party hereunder (Odessey) shall be liable for the payment of the promissory note herein mentioned or for the payment of any unpaid portion of the purchase price, unless such successor expressly agrees in writing to assume such liability, but any such successor shall take the interest to be conveyed hereunder subject to the seller's lien herein referred to and to the provisions of the deed of trust above mentioned. The officers of Second Party executing this contract and the instruments herein provided for shall not be personally liable for any obligations of Second Party herein provided.

Mr. Brinkley's share of the reserves in the subject property had been as-

signed an estimated productive life of 14 years, and a worth in 1956 of $2,593,957.50 by a Texas petroleum engineer retained by him for purposes of evaluating the reserve.

Five years after the contract with Odessey, Odessey was liquidated and the rights under the contract received from Mr. Brinkley were distributed to the stockholders.

■ It would appear to the Court that the conclusion to be reached by the Court as to whether the proceeds received by Brinkley are capital gains as he contends or ordinary income subject to depletion as contended by the Commissioner of Internal Revenue, rests upon whether plaintiffs have retained an "economic interest" in the mineral in place. See Oliver v. United States, 408 F.2d 769 (4th Cir. 1969). In reaching that conclusion, the Court must look to the substance of the transaction. In short, did Brinkley retain the right to share in the production upon which certain of the payments called for in the contract were dependent?

■■ The pertinent portions of the contract are as follows:

"1. The consideration to be paid First Party by Second Party in the purchase of said interest in said mineral estate is the aggregate sum of Eight Hundred Fifty Thousand ($850,000.00) Dollars, which shall be payable as follows:

(a) The sum of Eighty Thousand ($80,000.00) Dollars in cash upon the consummation of this contract.

(b) The sum of Sixty Thousand ($60,000.00) Dollars payable in monthly installments of Five Thousand ($5,000.00) Dollars each, the first of which monthly installments to be payable on or before September 1, 1956 and a similar installment on or before the first day of each succeeding month thereafter until twelve (12) such installments have been paid.

(c) The sum of Two Hundred Thousand ($200,000.00) Dollars payable in forty-eight (48) monthly installments, the first of which monthly installments to be payable on or before September 1, 1957, the remaining forty-seven (47) installments to be payable on or before the first day of each succeeding month thereafter for forty-seven consecutive months, the first forty-seven (47) of said installments being in the principal sum of Four Thousand One Hundred Sixty-six and Sixty-six/one hundredths ($4,166.66) Dollars each, and the forty-eighth (48) installment being in the principal sum of Four Thousand One Hundred Sixty-six and Ninety-eight/one hundredths ($4,166.98) Dollars.

(d) On or before September 30, 1961, and on or before the last day of each succeeding month thereafter until said promissory note is fully paid the sum of $3,333.33 or an amount equal to 65% of the gross receipts (less pipeline and ad valorem taxes and charges) from oil sales credited to the mineral estate herein agreed to be purchased and sold for the next preceeding calendar month, whichever is the lesser amount.

(e) Additional installments on or before September 30th of any year when there is produced to the credit of the mineral estate herein agreed to be purchased and sold during the yearly period applicable to such September 30th as hereafter provided oil in excess of the following amounts: 44,000 barrels for the yearly period from August 1, 1956 to August 1, 1957; 36,000 barrels for the yearly period from August 1, 1957 to August 1, 1958; 30,000 barrels for the yearly period from August 1, 1958 to August 1, 1959; 26,000 barrels for the yearly period from August 1, 1959 to August 1, 1960; 22,000 barrels for the yearly period from August 1, 1960 to August 1, 1961; 20,000 barrels for the yearly period from August 1, 1961 to August 1, 1962, and for each subsequent yearly period (any such yearly period being from August 1 of a calendar

year to August 1 of the next succeeding calendar year) until said promissory note is fully paid. The yearly period applicable to any September 30th date is the yearly period from August 1st of the next preceding calendar year to the August 1st immediately preceding such September 30th. Production shall be determined on the basis of pipeline runs for the applicable yearly period. The amount of any such additional installment provided for in this paragraph (e) shall be ninety (90%) percent of the receipts from oil production for the applicable yearly period determined as aforesaid in excess of the production amounts set forth above in this paragraph (e) and credited to the mineral estate herein agreed to be purchased and sold, deducting only from such receipts pipeline and ad valorem taxes and charges pertinent to such excess production.

(f) All payments hereinabove provided for shall be credited as payments on account of said promissory note."

And this be true regardless of the terminology of the contract, for one's right to a depletion allowance does not depend upon retention of ownership or any other particular form of legal interest in the mineral content of the land. It is enough if by virtue of the transaction one has retained a right to share in the mineral produced. See Palmer v. Bender, 287 U.S. 551, 557, 53 S.Ct. 225, 77 L.Ed. 489 (1933). In *Bender* the issue was raised as to whether lessees of an oil and gas lease were entitled to the depletion allowance when they transferred their operating rights to two oil companies. The Court in that case concluded that the lessees, whether they became technical sub-lessors or not, by reason of their retaining, by their stipulation for royalties, an economic interest in the oil in place, entitled them to the depletion allowance. In that case, the loss or destruction of the oil at any time from the date of the agreement until complete extraction would have resulted in a loss to the parties involved. So, too, in our instant case. Regardless of the use of the word "sale" in the contract between Brinkley and Odessey, his monetary receipts pursuant to paragraphs 1(d) and 1(e) of the contract heretofore set out were dependent upon production.

Treasury Regulation 1.611–1(b) (1) (1960) codifies the two pronged test spelled out by *Bender, supra.* That regulation is as follows:

> An economic interest is possessed in every case in which the taxpayer has (1) acquired by investment any interest in mineral in place . . . . and (2) secures, by any form of legal relationship, income derived from the extraction of the mineral . . . . to which he must look for a return of his capital.

See also, Anderson v. Helvering, 310 U. S. 404, 60 S.Ct. 952, 84 L.Ed. 1277 (1940); Commissioner of Internal Revenue v. Southwest Exploration Co., 350 U.S. 308, 76 S.Ct. 395, 100 L.Ed. 347 (1956); Christie v. United States, 436 F.2d 1216 (5th Cir. 1971).

It follows, therefore, that one who has an economic interest in the minerals from which he receives proceeds is entitled to a depletion allowance, and it also follows that being so entitled he is precluded from claiming would be benefits based on an alleged divestiture of all interest in those same minerals.

Under the case law by which this Court is bound, long term capital gains treatment is not permissible for proceeds derived from a portion of mineral rights in which an economic interest has been retained.

Plaintiffs contend that there was an absolute sale and the sums derived in 1966 and 1967 pursuant to paragraphs 1(d) and 1(e) of the contract are to be accorded long term capital gains treatment, and they contend that they "sold and conveyed all of their interest in the minerals involved and reserved nothing except a security interest for the deferred portion of the fixed and definite purchase price which deferred portion

was $770,000.00, neither more *nor less.*" (Emphasis ours.) It is their position that they were "to receive for their capital assets sold the sum of $850,000.00, neither more *nor less.*" (Emphasis ours).

While it is quite accurate to characterize the $850,000.00 figure as a ceiling, one can hardly conclude that the plaintiffs might not receive less, for under paragraphs 1(d) and 1(e) of the contract payment to Brinkley was dependent upon oil production. It is this feature which the Court finds gives plaintiff Brinkley an economic interest as enunciated by Palmer v. Bender, *supra,* and Treasury Regulation 1.611–1 (b) (1). The sums accruing to plaintiffs under the pertinent paragraphs are concretely linked to all production.

Plaintiffs cite Anderson v. Helvering, *supra,* for the contention that a transaction in which there is a fixed total price, with the payments broken down into an annual one and delayed payments geared to the production scale, represents an absolute sale warranting long term capital gains treatment. In *Anderson,* however, the assignee of the interest in all production was obligated to make payments out of monies derived from sales of the fee title to the property conveyed. See 310 U.S. p. 412, 60 S. Ct. 952, 84 L.Ed. 1277. Paragraph 20 of the instant contract, however, places upon Odessey no such obligation. Paragraph 20, *supra,* relegates Brinkley to a dependency strictly upon oil production and payments on the contract since a successor in interest to Odessey is not liable on the promissory note, a situation which has existed since 1961 when Odessey was liquidated and its interest divided amongst its shareholders. While a failure of production precluding any payments would have permitted him to enforce the "seller's lien" against Odessey's successors, if there were not oil production there would be no payment due. Any such right to enforce the sales lien against Odessey's successors is devoid of substance. As Judge Craven in *Oliver, supra,* has stated, "it is axio-

matic that the tax consequences of the transaction are to be governed by substance, not form." See also Royalton Stone Corp. v. Commissioner of Internal Revenue, 379 F.2d 298 (2d Cir. 1967).

The issue before the Court in no manner dealt with the tax treatment of payments received by Brinkley under any paragraphs of the contract other than the ones herein discussed.

Concluding that the plaintiffs are not entitled to capital gains treatment on payments received under paragraphs 1(d) and 1(e) of the contract, and pursuant to stipulation entered into between the parties, the defendant having prevailed, the complaint will be dismissed, with each side bearing its own costs.

An appropriate order will enter.