**James T. COX, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Civ. A. No. C–68–102–E.**

United States District Court, N. D. West Virginia.

June 4, 1973.

Boyd L. Warner and W. Mote Thompson, Jr., Stathers & Cantrall, Clarksburg, W. Va., for plaintiff.

James F. Companion, U. S. Atty., Wheeling, W. Va., Helen E. Marmoll, U. S. Dept. of Justice, Washington, D. C., for defendant.

MAXWELL, Chief Judge.

This is a civil action authorized under 28 U.S.C. § 1346(a) and instituted by the Plaintiff-Taxpayer, James T. Cox (hereinafter referred to as Taxpayer), for the recovery of federal income taxes, allegedly overpaid for the calendar years 1963 and 1964. On April 22, 1968, the Commissioner of Internal Revenue established his position on the issues presented in this litigation by disallowing Taxpayer's claims for refund.

The facts are undisputed in this litigation and have been stipulated by the parties in the pre-trial order submitted by counsel.

Succinctly stated, the facts are that in 1959, one A. T. Carr of Chesterville,

Ohio, secured leases of 1,194 acres of oil and gas lands in New Milton and Cove Districts of Doddridge County, West Virginia. Mr. Carr's initial investment in this venture was $1,194.00, or $1.00 per acre.

Sometime in 1959 or 1960, Mr. Carr and the Taxpayer, a resident of this judicial district, whose principal occupation is the operation of his own furniture store, entered into an informal partnership agreement whereby Taxpayer contributed $2,000.00 toward the development of one of the leases in exchange for a half interest in all the leases. The Carr-Cox partnership agreement was formalized in writing in 1963.

Following a successful drilling operation by an independent developer on adjacent land, the Carr-Cox partnership (hereinafter referred to as Partnership) assigned ten leases to various individuals and companies. Pursuant to these assignments the Partnership retained a $\frac{1}{16}$th overriding royalty interest of the $\frac{7}{8}$th working interest in each of the ten leasehold assignments. Thus, each partner's retained share amounted to a $\frac{1}{32}$nd overriding royalty interest in the ten leases. In addition to the $\frac{1}{16}$th overriding royalty interest, there was the further retention by the Partnership in one lease of a $\frac{1}{4}$th working interest, subject to the reserved overriding royalty interest, of the $\frac{7}{8}$th working interest, or a $\frac{1}{8}$th working interest as to each partner.

The initial proceeds from these assignments, $180,125.00 in 1963 and $115,000.00 in 1964, were equally divided by the two partners. On his federal income tax returns for 1963 and 1964, Taxpayer treated his share of the profits as long-term capital gains.

The Commissioner of Internal Revenue determined that the income from the assignments constituted ordinary income and assessed deficiencies in the amount of $12,156.17, plus $1,776.72 interest for the tax year 1963, and $5,556.63, plus $478.70 interest for the tax year 1964.

Taxpayer paid the assessed amounts with interest and filed a claim for a re-

fund, which was disallowed by the Commissioner. Taxpayer then instituted this action seeking recovery of the amounts paid plus interest from October 8, 1966. Following a hearing in this matter the case was submitted to the Court on briefs, the pre-trial order and oral argument of counsel.

The issue presently before this Court is whether the retention by the Partnership of the overriding royalty interests, and the additional retention of a working interest as to one assignment, prevents the transactions from being a "sale or exchange" under Section 1222(3) of the Internal Revenue Code and thereby foreclosing long-term capital gain treatment of the proceeds of the disposition.

The well recognized term, "long-term capital gain" is defined by Section 1222 (3) of the Internal Revenue Code [26 U. S.C. § 1222(3)] as the

gain from the *sale or exchange of a capital asset held for more than 6 months,* if and to the extent such gain is taken into account in computing gross income. (emphasis added).

The purpose of the capital gains provisions is to:

relieve the taxpayer from . . . excessive tax burdens on gains resulting from a conversion of capital investments, and to remove the deterrent effect of those burdens on such conversions.

Burnet v. Harmel, 287 U.S. 103, 106, 53 S.Ct. 74, 75, 77 L.Ed. 199 (1932).

There is no dispute as to the nature of the interests transferred by the Partnership in this case. The Commissioner agrees that the leases involved herein constitute a capital asset and further that they were held by the Partnership for more than 6 months.

In disallowing capital gain treatment, however, the Commissioner determined that the transactions were not "sales or exchanges" as contemplated by § 1222(3) in that the Partnership, in reserving overriding royalty interests, and an additional working interest, had retained an economic interest in the gas in place.

The initial proceeds from the transactions were considered to be bonus payments, taxable as ordinary income subject to the statutory depletion deduction, or depletion allowance as it is sometimes referred to.

The crux of the Commissioner's position in the present case centers around the phrase "economic interest," a term first employed by the United States Supreme Court in Palmer v. Bender, 287 U. S. 551, 53 S.Ct. 225, 77 L.Ed. 489 (1933).

In holding that the retention of an economic interest was required before a taxpayer was entitled to a depletion deduction the Court in *Palmer* stated:

The language of the statute [now § 611 of the Internal Revenue Code] is broad enough to provide, at least, for every case in which the taxpayer has acquired, by investment, any interest in the oil in place, and secures, by any form of legal relationship, income derived from the extraction of the oil, to which he must look for a return of his capital.

287 U.S. at 557, 53 S.Ct. at 226.

This language was incorporated almost verbatim into § 1.611–1(b)(1) of the Treasury Regulations which provides:

(b) *Economic interest.* (1) Annual depletion deductions are allowed only to the owner of an economic interest in mineral deposits or standing timber. An economic interest is possessed in every case in which the taxpayer has acquired by investment any interest in mineral in place or standing timber and secures, by any form of legal relationship, income derived from the extraction of the mineral or severance of the timber, to which he must look for a return of his capital. . . .

Thus, the language from *Palmer* has become the guide in determining the appropriateness of a depletion deduction. Moreover, the Commissioner asserts that this same criteria should be applied in determining whether certain proceeds are taxable as ordinary income or should receive capital gains treatment. The

Commissioner's reasoning is that the tax concepts of a depletion deduction and long-term capital gains are mutually exclusive since the retention of an economic interest in a capital asset precludes the taxpayer from treating the transaction as a sale.

The Commissioner maintains that the Taxpayer here has retained an economic interest and that he is therefore entitled to a depletion deduction and not capital gains treatment.

The Taxpayer, on the other hand, argues that the Partnership intended to complete, and in fact did complete, the sale of a fractional interest in the leasehold estate. Helvering v. Elbe Oil Land Development Co., 303 U.S. 372, 58 S.Ct. 621, 82 L.Ed. 904 (1938), is cited for Taxpayer's proposition that "[t]he mere retention of an interest in an oil and gas lease does not by itself keep a sale from being a sale."

The Taxpayer relies on the terms of the agreements as evidence of a sale. The granting clause in each of the ten instruments, as it is included in the pretrial order, provides:

Assignor [Cox-Carr partnership], subject to the reservations, exceptions, terms and conditions herein contained, grant, sell, convey, assign, transfer, and set over unto the said Assignee [name], all that certain leasehold estate, consisting of [X] acres.

Likewise, the Taxpayer emphasizes the absence of any provisions requiring the assignees to develop the leasehold estates and the absence of any provisions allowing for a possibility of reverter.

The Taxpayer calls to the Court's attention that the amounts received by the partnership in exchange for the leasehold estates greatly exceeded the Partnership's investment. He also submits in effect that the retained interest in this case is too insignificant to "taint" the validity of the sale and the Commissioner's position would unjustifiably deprive the Taxpayer of the benefits of long-term capital gains treatment.

In the analysis of a business transaction, it is recognized that the substance, and not the form, governs the tax consequences of that transaction. Oliver v. United States, 408 F.2d 769 (4th Cir. 1969). Difficulty is experienced in determining tax consequences, however, when the economic interest test is applied to transactions, such as are involved in this litigation, which possess some traditional characteristics of both sales and leases.

But in the law of conveyances and contracts, oil and gas leases and attendant documents, have been set apart. Because of the complicated challenges of drilling for and then controlling the "captured" oil and gas, the historic view of mining laws was not adequate and the courts and legislatures developed new concepts based on prevailing law.

In addition to a sizeable use of expressed or implied promises to explore and develop leased property, oil and gas leases are now established in law as creating fixed terms of property interest. They also define the obligations assumed by the parties, especially the lessee.

One of the notable variables usually found in oil and gas leases is the right of the lessee to assign his interest to another. This is a necessary right in the practical business world of the oil and gas industry. The banking industry requires of its most responsible customers that they employ commercial leases as collateral for borrowing, operating or working assets.

Also, in an effort to obtain venture capital from third parties, assignments of fractional interests are an accepted business practice to defray the high costs of drilling.

Purchases through assignment of fractional interests in mineral estates thus become a valid method of ownership, a capital asset. This method of transfer of mineral estates is binding, and additionally are recognized today as equitable working contracts and undertakings between the parties.

Here we do not have the situation where an operator is raising finances to develop and explore for oil and gas. But the principle of divisibility of ownership of real estate-mineral interest remains.

The interest retained here, as a result of the assignments, would appear to bear the characteristics of an absolute, sovereign, independent partition of ownership. The retained interests reflect a self-contained, autonomous state that responds and develops independent of the whole. Thus, it becomes critically important to measure the issues presented here against the acceptability of such transactions in the oil and gas industry. It is by this evaluation that we can truly and factually "look to the substance of the transaction."

The second aspect of the economic interest test requires "income derived from the extraction of the mineral . . . to which he [the taxpayer] must look for a *return of his capital.*" (emphasis added). As pointed out by the Taxpayer, however, the initial payments to the Partnership, which were not dependent upon production, exceeded the original expenditures and the Partnership recouped its capital investment at the outset. Viewed in a realistic light, the Partnership, after the assignments in issue, no longer looked to the production of the gas for a return of its capital and, as a result, the Partnership no longer concerned itself with the risks of production of the gas.

 The recoupment of the initial investment, the corresponding absence of an element of risk-sharing and the lack of obligatory provisions regarding production are persuasive that the Commissioner's position in the present case is too broad. This Court is satisfied that the transfer of the Partnership's interest constituted a sale or exchange. Helvering v. Elbe Oil Land Development Co., supra; Commissioner v. Remer, 260 F.2d 337 (8th Cir. 1958).

Brinkley v. United States, 340 F.Supp. 417 (E.D.Va.1972), presents a representational case where the parties entered into a contract involving "the mineral estate herein agreed to be purchased and sold" and which materially reflects a retained economic interest, thus depriving the sellers of capital gains treatment of the proceeds of the transaction. Under the facts of *Brinkley,* and particularly the terms of the contract under review, Brinkley's monetary receipts were "concretely linked" and dependent upon production. Under the facts of *Brinkley* it was the extraction of minerals that secured the return of capital.

It would be an unwarranted extension of the principles, applied in *Palmer, Oliver* and *Brinkley,* to link here the separate, distinct, divisible mineral estates and to find or suggest that the possibility of future production, within the entire estate, involving the several part owners, thus destroys Taxpayer's capital gains position.

Consequently, the Taxpayer was correct in treating the proceeds as capital gains and he is entitled to the relief which he seeks in this action, and an appropriate order consistent with the reasons and conclusions above stated will be entered.