JAMES E. PUSCAS, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Puscas v. Commissioner
Docket No. 8562-74.
United States Tax Court
T.C. Memo 1978-73; 1978 Tax Ct. Memo LEXIS 446; 37 T.C.M. (CCH) 358; T.C.M. (RIA) 780073; 60 Oil & Gas Rep. 139; February 23, 1978, Filed James E. Puscas, pro se. Hector C. Perez, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined a deficiency in petitioner's income tax for the calendar year 1970 in the amount of $2,926.42.The issues for decision are: (1) Whether petitioner is entitled to *447 a deduction for intangible drilling and development costs in connection with a limited partnership agreement which he entered into with Moray Oil Producers 1970, Inc. of Los Angeles, California; and (2) in the alternative, is petitioner entitled to a deduction in 1970 as a loss from a transaction entered into for profit or as a theft loss of the amount he paid as an investment in the partnership in that year. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioner, who resided in Anaheim, California at the time his petition in this case was filed, is a physician actively engaged in the practice of medicine. He filed his 1970 Federal income tax return with the Internal Revenue Service Center at Fresno, California.
On July 27, 1970, petitioner paid $6,000 to Capital Conservation as an investment in a limited partnership with Moray Oil Producers 1970, Inc. of Los Angeles (Moray). The partnership was formed for the purpose of drilling and developing oil and gas wells in Kansas. Petitioner was the limited partner and Moray was the general partner in the partnership.At the time a representative of Capital Conservation, which was an agent *448 for Moray, approached petitioner with respect to investing in the limited partnership, he represented the investment to petitioner as a tax shelter but also as possibly resulting in a profitable oil-producing operation. The representative of Capital Conservation was not a stranger to petitioner since petitioner's partner and several other friends of his had already invested in limited partnerships with Moray. At the time petitioner agreed to invest in the partnership, he was presented with a packet which contained instructions for completing the partnership agreement and a limited partnership agreement, together with an attached exhibit purporting to show the area in which the well referred to in the partnership agreement was to be drilled, a drilling contract, an optional declaration of pooling of working interest and an operating agreement. The instructions stated that only one agreement was required regardless of "the number of wells you are purchasing." The statement was made that the general partner would insert the figures in the blanks on page 4 showing the sum to be contributed to the partnership, the amount to be paid in cash, and the amount to be represented by an interest-bearing *449 note payable out of production of the limited partner's interest in the well drilled upon the tract covered by the agreement. The instructions contained information as to where the limited partner's name, address and signature should appear on the agreement and stated that the completed agreement was to be returned with a check in the amount of $5,000 per well to Moray. [1] The partnership agreement provided, with respect to the purposes of the partnership, in part as follows: 1. The General Partner represents that it is the owner of Dubros, Inc., a Kansas corporation, as a fully owned subsidiary. General Partner further represents and warrants that it is the owner of or controls certain lands in the State of Kansas with certain producing wells thereon. The purpose of this Partnership will be to acquire drill sites from Dubros, Inc., and thereafter to drill, test, complete and equip oil and/or gas wells thereon which will be pooled with the remaining wells and lands mentioned herein. 2. Attached hereto is a plat marked Exhibit "A" for identification and be [sic] reference made a part hereof, which plat designates with particularity the lands covered by the oil and *450 gas leases which are the subject matter of this Agreement. Also shown are the producing wells situate thereon. In addition thereto, there is designated on said Exhibit "A" the drill site upon which the wells covered by this Partnership Agreement shall be drilled.
3. It is mutually understood and agreed that the wells which will be drilled upon the location described in Exhibit "A" hereof will be drilled as soon as practicable after the execution of this Partnership Agreement. It is further understood and agreed by the parties hereto that General Partner shall employ Dubros, Inc., to drill the wells provided for in this Agreement and there is attached hereto a Drilling Contract between Dubros, Inc., as the drilling contractor, and Moray Producers, 1970, Inc. The partnership agreement contained the following provisions with respect to the rights and obligations of the general partner: 1. The General Partner shall have full, exclusive and complete discretion in the management and control of the affairs of the Partnership for the purposes herein stated and shall *451 make all decisions affecting the Partnership affairs. 2. The General Partner shall manage and control the affairs of the Partnership to the best of its ability and shall use its best efforts to carry out the purposes of the Partnership as set forth in Article IV. hereof. In connection with which it: a. shall maintain at the expense of the Partnership adequate records and accounts of all operations and expenditures and furnish the Limited Partner with quarterly statements of account together with all necessary tax reporting information as of the end of each calendar year for federal income tax purposes, and, to the extent permitted, for state and local income tax purposes, the Partners, both General and Limited, elect to charge to expense all intangible drilling and development costs pursuant to the provisions of Section 263(c) of the Internal Revenue Code and the General Partner shall make such election on the necessary Partnership returns; The drilling contract attached to the partnership agreement indicated that the partnership was entering into a turnkey drilling contract with Dubros, Inc. (Dubros). Under the contract, Dubros agreed to drill the *452 well and, upon completion of the well, agreed to accept the cash and note contributed by the limited partner. The president of both Dubros and Moray was Charles Raymond. Dubros and Moray were subsidiaries of Westland Minerals Corporation, which was also owned by Mr. Raymond. In 1974, Mr. Raymond was indicted by a Grand Jury in the United States District Court for the Eastern District of Pennsylvania on 25 counts. Insofar as here pertinent, Count I of this indictment charged as follows: 1. That beginning from on or about November 1, 1969, and continuing through on or about December 31, 1972, in the Eastern District of Pennsylvania and elsewhere, defendants CHARLES F. RAYMOND, * * *, in the offer and sale of securities, namely, investment contracts, participations in profit sharing agreements involving interests in oil and gas leases in Kansas known collectively as "the Moray Oil Programs" * * *, by the use of means and instruments of transportation and communication in interstate commerce and by the use of the mails, directly and indirectly, unlawfully, wilfully and knowingly, did employ a device, scheme and artifice to defraud, and did obtain money and property by means of *453 untrue statements of material facts and omissions to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, and did engage in transactions, practices and courses of business which would and did operate as a fraud and deceit upon purchasers (hereinafter referred to as "Investors") of the above described securities each and all of whom were members of and constituted a class of persons whom the defendant believed could be induced to purchase said securities, all in the following manner: 2. In November of 1969, RAYMOND * * * purchased Dubros, Inc. and caused the incorporation of Moray Oil Co., Inc., both Kansas corporations, whose affairs at all times material herein, were dominated and controlled by RAYMOND. 3. In November, 1969 RAYMOND, * * *, and others formulated a tax shelter program involving the sale of Kansas oil wells owned and to be acquired by Moray Oil Co., Inc., and its subsidiaries.This program consisted of limited partnerships in Kansas oil wells which interests were sold for $12,500, $13,000 and $13,150 per well. Each limited partnership was composed of one limited partner *454 (the public investor) and a general partner (Moray Oil Co., Inc. or Moray Oil Producers 1970, Inc.-hereinafter referred to as Moray). The public investor was required to contribute a total cash contribution of either $5,000, $5,500 or $5,650 per well and to execute a promissory note for $7,500 made payable to Dubros, the drilling company. The total investment was allegedly to be used to drill and complete the Kansas wells. The $7,500 promissory note was to be repaid from either 50 percent or 70 percent of production and the balance of production was to go to the investor. * * *
6. From November, 1969 through December, 1971, defendants, RAYMOND, * * * sold and caused to be offered and sold to approximately 250 investors in Pennsylvania, California, New Jersey and Delaware and other states, the above described interests in the Moray Oil Programs raising approximately $2,200,000. 7. From November, 1969 through July, 1970, defendant CHARLES F. RAYMOND diverted and caused to be diverted approximately $500,000 from the Moray Oil Programs which diversions were for purposes unrelated to drilling and completing of the Kansas wells including but not limited to those for his own *455 personal use, advantage and benefit. These diversions and conversions of monies were concealed by RAYMOND from investors and prospective investors. * * *
18. For the purposes of inducing investors to invest in the aforesaid Moray Oil Programs, of obtaining money and property from said investors, and of lulling investors into a false sense of security as to the merit and value of their investments, the defendants RAYMOND, * * * caused to be made, both directly and indirectly, false and misleading representations of material facts to the investors well knowing at the time that said representations would be and were false and misleading when made, the aforesaid representations including but not limited to the following: (a) that investor monies would be kept in an escrow account which would be a separate and segregated account from other monies; (b) that the cost to drill and complete a well in Kansas exceeded the cash contribution of each investor; (c) that the $7,500 notes signed by the investor would be used to obtain financing in order to drill and/or complete the wells; (d) that monies raised from investors would be expended solely for the purpose of drilling and *456 completing the wells; (e) that production from the wells would be sufficient to pay back or fund the note in approximately four or five years; (f) that the $7,500 notes personally signed by the investor would be non-assignable and non-negotiable; (g) that the investor was not personally liable on the $7,500 note; (h) that intangible drilling costs for drilling and completing a well were approximately $12,000; (i) that in return for his investment, the investor would be assigned a newly drilled and completed well. 19. For the purposes of inducing the investors to invest in the aforesaid Moray Oil Programs, and of obtaining money and property through the sale and offer for sale of these securities defendants RAYMOND, * * * would and did omit to state material facts and did cause the omission of material facts which were necessary to be stated in order to make the statements made, in light of the circumstances under which they were made, not misleading, including but not limited to the following: (a) that during May through July of 1970, defendant RAYMOND would and did overdraw and cause to be overdrawn Moray Oil Co., Inc. bank accounts and affiliated bank accounts in *457 excess of $30,000; (b) that of $818,000 raised from investors from November 1969 through July 1970 to drill and complete Kansas wells, only approximately $300,000 would be and was used for said purposes and that defendant RAYMOND would and did divert and cause to be diverted $500,000 for purposes unrelated to the Moray Oil Programs including but not limited to those for his own personal use, benefit and advantage; (c) that of the monies raised from investors in the Moray Oil Programs from November 1969 through August 1971 defendant RAYMOND would divert and continue to divert investor for purposes unrelated to drilling and completing the Kansas wells resulting in that of approximately $2,200,000 of monies raised from investors only approximately $1,100,000 would be applied to drilling and completing the Kansas wells; (d) that the actual cost to drill and complete the wells in the Moray Oil Programs was less than the investor's cash contribution; (E) that the $7,500 personal note signed by the investor was intended as profit to Moray Oil Co., Inc. and its subsidiaries and was not going to be used to raise additional monies to drill and complete the wells; (f) that some investors *458 had been permitted to enter into agreements which provided for the repurchase of the $7,500 personal note for nominal amounts; (g) that the $7,500 personal notes would be and were assigned to Bahamian banks, including Nassau Bank and Trust Co. and International Bank and Trust, Ltd., by defendant CHARLES F. RAYMOND; (h) that from November, 1970, Mid-America Refining Co. had withheld and would continue to withhold distribution of production proceeds to Moray Oil Co., Inc. and consequently, to investors from the sale of oil because of title flaws in the leasehold interests claimed by Moray Oil Co., Inc. 20. In order to lull investors into a false sense of security, and to deceive investors and potential investors as to the true status of the Moray Oil Programs, defendants RAYMOND, * * * did disseminate and did cause and permit the dissemination of false and misleading reports and correspondence to investors. 21.Defendant CHARLES F. RAYMOND engaged in a transaction, practice, and course of business which operated as a fraud and deceit upon investors by diverting substantial sums of monies raised for the purpose of drilling and completing wells in Kansas for his own personal use, *459 benefit and advantage, and concealing said diversions by purchasing property in Kansas containing approximately 108 existing wells, and thereafter assigning these wells to numerous investors in the Moray Oil Programs. Counts II thru XXV of the indictment were various mail fraud counts. On May 20, 1975, Mr. Raymond pleaded guilty to all counts of the indictment except Counts XIV through XIX. He was sentenced to 15 months in prison on Count 1, with prison sentences on the other counts being suspended. Some time around June of 1974, petitioner first began to hear rumors that the owners and officers of Moray were being investigated. By October of 1974, he had received information with respect to the investigation of Moray and its officers that made him relatively sure that he had been persuaded to invest in a Moray limited partnership through fraudulent misrepresentation. Beginning in January 1973 and continuing until July 1974, an investigation of Moray was conducted by agents of the Internal Revenue Service. These agents found between 300 and 350 limited partnership agreements of various individuals with Moray which were in the exact form of petitioner's agreement except *460 as to the figures placed in the blanks. They found copies of partnership tax returns which had been made up by Moray for each of the partnerships. Most of the partnership returns had been filed with the Government. They also found information indicating that a copy of each return had been sent by Moray to the indicated limited partner. They found no books maintained for the individual partnerships. They found that the funds paid by the limited partners-investors had been intermingled into Moray's funds and they were unable to trace the disbursements of any particular payment. The only distinction in the various partnership agreements was that each partnership was assigned a different number. During the investigation the investigating agents attempted to ascertain if any wells had been actually drilled by Moray or Dubros. They went to Kansas and found that a small drilling company had received checks from Dubros and had drilled five or six wells. These wells were shallow wells and it appeared that they had never produced. Respondent's agents could locate no other drilling of any kind done by Moray or Dubros in the Kansas area. The agents found no evidence of any payments of *461 intangible drilling and development costs as related to any specific well. Petitioner, during 1970, received various letter reports from Moray and in 1971 received a copy of the 1970 partnership return which Moray had filed for the partnership with the Internal Revenue Service. This return disclosed a loss of $11,850 occasioned by a deduction for intangible drilling costs. During 1972 and 1973, petitioner continued to receive information from Moray and received copies of the partnership returns for those years filed by Moray. In early 1975 petitioner received from Moray a United States Partnership Return of Income for 1974 with a caption which appeared to come from a label placed on the return form when mailed by the Internal Revenue Service which read: CV 95-6304946 DEC 31, 1974 D95 L * MORAY PRODUCERS 1970 INC & JAMES PUSCAS PTR MORAY PRODUCERS 1970-125, 10642 SANTA MONICA BLVD, LOS ANGELESCA 90025 This return disclosed no gross receipts, a depreciation deduction of $34, and a loss of $34. It showed a date of signing of February 19, 1975. On November 27, 1972, the Washington Regional Office of the Securities and Exchange Commission announced the filing of a civil *462 injunctive complaint in the United States District Court for the Eastern District of Pennsylvania against various entities including Moray and Dubros. The announcement stated that the complaint requested the appointment of a receiver and an accounting for Moray and Dubros. Petitioner on his Federal income tax return for the calendar year 1970 claimed a loss of $11,850 from the Moray limited partnership. This claimed loss resulted solely from deductions for intangible drilling and development costs claimed by the partnership on its return. Respondent in his notice of deficiency disallowed the claimed loss with the statement that the "partnership failed to show that it had a working or operating interest in a mineral property, that oil or gas wells were drilled, or that intangible drilling costs were either incurred or paid." In his petition, petitioner claimed in the alternative that if he were not entitled to an intangible drilling cost deduction he should be entitled to deduct in 1970 his $6,000 out-of-pocket cost of his partnership interest as a loss from a transaction entered into for profit. At the trial petitioner claimed as a further alternative that he should be allowed *463 the $6,000 deduction in 1970 as a theft loss. OPINION Section 263(c), I.R.C. 1954, [2] authorizes a taxpayer to elect to deduct intangible drilling and development costs of oil and gas wells as expenses in accordance with regulations prescribed by the Secretary or his delegate. Section 1.612-4(a), Income Tax Regs., [3] which was promulgated pursuant to section 263(c), provides that intangible drilling and development costs incurred "by an operator in the development of oil and gas property" may be charged at the election of the operator to capital or to expense. The regulation further specifies the expenditures "made by an operator" to which the election is applicable. *464 It is clear from the regulation that in order to be entitled to the deduction for intangible drilling and development costs the person claiming the deduction must be an operator, which means he must have a working interest in an oil or gas well and the expenditures must have been for drilling of that well. As we pointed out in Cottingham v. Commissioner,63 T.C. 695, 706 (1975) -- we interpret section 1.612-4(a) of the regulations, supra, to mean that the election under section 263(c) is available only respecting expenditures actually made for drilling and developing or completing a well on property in which the operator has a working or operating interest of the same sort as required for the depletion allowance deduction. See Commissioner v. Estate of Donnell,417 F.2d 106, 111 (C.A. 5, 1969); Commissioner v. Southwest Exploration Co.,350 U.S. 308, 314 (1956). The facts we have found here in no way support a conclusion that petitioner had any working or operating interest in any oil or gas well. Petitioner testified that he did not know whether any well was assigned to his partnership or whether any drilling was done *465 on any such well. The clear indication from the record is that petitioner did not have any working or operating interest in any property. The record indicates little, if any, drilling was done by Moray or Dubros in the Kansas area in connection with any of its 300 or more limited partnerships which had been sold to various "investors." On the basis of this record and our holding in Cottingham v. Commissioner,supra, we sustain respondent's disallowance of petitioner's claimed deduction for a loss from his Moray limited partnership since this loss resulted from deductions claimed by the partnership for intangible drilling and development costs which have not been shown to be properly deductible. [4]
Petitioner has likewise failed to establish that he *466 is entitled to a deduction in 1970 of his $6,000 investment in the Moray limited partnership as a loss from a transaction entered into for profit.The record does not show that this investment had no value at the end of 1970. There is an indication in the record that Moray was still selling these "partnership interests" into 1972. It would be logical to conclude from this fact that petitioner could at the end of 1970 have sold his "partnership interest." The fact that in late 1972 the Securities and Exchange Commission had requested the appointment of a receiver for Moray and Dubros further indicates that as of the end of 1970, petitioner's investment still had some value. The fact that a large portion of the funds paid in by investors in the Moray partnership were misappropriated does not mean that nothing could be salvaged. Also, the record does not show that all funds paid into Moray had been misappropriated by the end of 1970. This record totally fails to establish that in 1970 petitioner sustained a loss from a transaction entered into for profit from his investment of $6,000 in the Moray partnership. In our view the record does show that the $6,000 which petitioner paid *467 as an investment in the Moray partnership was obtained from him by false and fraudulent representations. From this we would conclude that when it was apparent that petitioner's $6,000 was lost, and petitioner discovered the facts concerning that loss, petitioner had sustained a theft loss. The record is clear that petitioner did not discover the circumstances surrounding Moray's activities in 1970. In fact, the clear indication from the record is that the earliest petitioner became in any way alerted to the fact that the $6,000 may have been obtained from him through some form of fraud was in 1974 when petitioner heard about the indictment of Mr. Raymond and others for fraudulent sale of securities and mail fraud in connection with their activities in Moray and Dubros. Also, it was certainly not earlier than 1974 that the fact that petitioner would not receive any return of his $6,000 became apparent. Section 165(e) provides with respect to theft losses that any loss arising from theft "shall be treated as sustained during the taxable year in which the taxpayer discovers such loss." See *468 McKinley v. Commissioner,34 T.C. 59 (1960). The record totally fails to show that petitioner discovered any possible theft loss with respect to his $6,000 investment in the Moray limited partnership prior to 1974. Decision will be entered for the respondent. Footnotes
1. The record shows that in fact petitioner paid $6,000 to Moray purportedly for one well.↩
2. All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise stated. SEC. 263. CAPITAL EXPENDITURES. * * *
(c) Intangible Drilling and Development Costs in the Case of Oil and Gas Wells.--Notwithstanding subsection (a), regulations shall be prescribed by the Secretary or his delegate under this subtitle corresponding to the regulations which granted the option to deduct as expenses intangible drilling and development costs in the case of oil and gas wells and which were recognized and approved by the Congress in House Concurrent Resolution 50, Seventy-ninth Congress. ↩
3. Sec. 1.612-4 Charges to capital and to expense in case of oil and gas wells. (a) Option with respect to intangible drilling and development costs. In accordance with the provisions of section 263(c)↩, intangible drilling and development costs incurred by an operator (one who holds a working or operating interest in any tract or parcel of land either as a fee owner or under a lease or any other form of contract granting working or operating rights) in the development of oil and gas properties may at his option be chargeable to capital or to expense. This option applies to all expenditures made by an operator for wages, fuel, repairs, hauling, supplies, etc., incident to and necessary for the drilling of wells and the preparation of wells for the production of oil or gas. Such expenditures have for convenience been termed intangible drilling and development costs. They include the cost to operators of any drilling or development work (excluding amounts payable only out of production or gross or net proceeds from production, if such amounts are depletable income to the recipient, and amounts properly allocable to cost of depreciable property) done for them by contractors under any form of contract, including turnkey contracts. * * *
4. In Sanderson v. Commissioner,T.C.Memo. 1977-40, and Heberer v. Commissioner,T.C.Memo. 1974-139↩, we also sustained respondent's disallowance of each taxpayer's claimed deduction for intangible drilling costs where the taxpayer failed to show that he had an "economic interest" in the property with respect to which the drilling costs were claimed to have been paid.